| From: | Steve O'Connell </O=CITATION CORP/OU=CCHQ/CN=RECIPIENTS/CN=BERSTEVEO> |
|---|---|
| Sent: | Tuesday, December 20, 2011 1:34 PM |
| To: | Wayde Schwarz <WSchwarz@grede.com>; Paul Sitter <PSitter@grede.com> |
| Subject: | FW: Brooks |
| Attach: | B. Arruda - quotes - CR.pdf |

Steve O'Connell
Operations Manager
Grede LLC
Cell: (920) 279-3669
Office: (920) 361-2220

**From:** AARRUDA314@comcast.net [mailto:AARRUDA314@comcast.net]
**Sent:** Friday, December 16, 2011 6:12 PM
**To:** Steve O'Connell; Mitchell Kidd
**Subject:** Brooks

List of materials needed for re-heat oven and in addition to attachment we will need 3 -10ft x4" SS 316 tubing and 10 pcs of 1" SS solid rod 10 ' long each pc also 316 SS. Need to move job to week of the 9th of Jan if possible.

**Regards,**
**Brooks Arruda**

**From:** burkhart@burkhartrefractory.com
**To:** aarruda314@comcast.net
**Sent:** Friday, December 16, 2011 2:45:23 PM
**Subject:** FW: Material Pricing

Good afternoon Brooks,

Attached to this email are the material quotes you requested. Please review the quotes and contact me with any questions or to place an order. Remember that the materials must be ordered through the appropriate company BRII and CSI.

Thank you,
Chris Rush

Burkhart Refractory Instl. Inc.
301 Beagle Road
Bethel, PA 19507
Phone: 717-933-8738

0000313

Fax: 717-933-5674

Ceramic Systems Inc.
PO Box 354
5811 Four Point Road
Bethel, PA 19507
Phone: 717-933-1477
Fax: 717-933-1577

Professional Coating Technologies, Inc.

1001 Mt. Lebanon Rd.
Cedar Hill, TX 75104

# Invoice

| Date | Invoice # |
|---|---|
| 1/16/2012 | 10648 |

**Bill To**

Grede
242 South Pearl Street
Berlin Wisconsin 54923

| P.O. No. | Terms | Project |
|---|---|---|
| 55066 | net 20 | |

| Item | Description | Amount |
|---|---|---|
| Professional services- | OVEN PROJECT: Client direction by Wayde Schwarz,Engineering Manager; | 17,168.00 |
| Professional services- | Work Performed from 1/7/2012 thru 1/13/2012, by and under direction of Brooks Aarruda: | |
| | Chip out 15 burner blocks; cut and fit 10" of 2600 degree ceramic fiber blanket, 10 inches thick on each burner; | |
| | Re-ram 15 burner tiles with flare for new still burners; | |
| | Pour new door with light weight castable; | |
| | Design new steel door with drawings and oversee fabricators build; | |
| | Close front arch down to 42" with insulating fire brick; | |
| | Install new lent ale across front of oven; | |
| | Clean off all debris from roof of oven; | |
| | Pour / cast roof of oven with light weight castable; | |
| | Repair and re-ram all cracked walls in furnace; | |
| | Install ceramic fiber blanket seal to rear seal of furnace; | |
| | Drill 4 holes and install 4 thermal couples; | |
| | Design and install new ceramic fiber door seal and gasket for newly designed door; | |
| Professional services- | Work to be Performed 1/19/2012 and 1/20/2012: | |
| | Start up and dry out of oven; | |

| | | |
|---|---|---|
| | **Total** | $17,168.00 |
| Pay online at:: https://ipn.intuit.com/pr3c9cxg | **Payments/Credits** | $0.00 |
| | **Balance Due** | $17,168.00 |

| Phone # | Fax # |
|---|---|
| 972-291-7474 | 972-291-6224 |

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 3 of 113   Document 72-1   PRO COATINGS_000052



GREDE 0444



**Case Number:**
0500-0678

**Case Title:**
Grede Foundry

**Subject of Report:**
Allan "Brook" Arruda, November 1, 2015

**Reporting Official and Date:**
William M. Oros Jr.
Special Agent
*15-DEC-2015, Signed by: William M. Oros Jr.*

**Reporting Office:**
Chicago, IL, Area Office

**Activity Date:**
December 1, 2015

**Approving Official and Date:**
Jeffrey D. Martinez
Special Agent in Charge
*16-DEC-2015, Approved by: Jeffrey D. Martinez*
*Special Agent in Charge*

### SYNOPSIS

Arruda said he spoke with Mitch Kidd, Steve O'Connell, and Angel Silva and told them there were cracks in the brick refractory in the ceiling of the heat treat oven and that four inches of a light weight casting would need to be poured over the roof of the heat treat oven to seal the cracks. Arruda also told them before the casting could be poured the roof of the heat treat oven would need to be cleared of debris and insulation. He said he went to Kidd, O'Connell, and Silva because he needed manpower to remove the debris and insulation. Kidd told him anything he needed go through O'Connell and Silva.

### DETAILS

On December 1, 2015, this Reporting Agent (RA) Will Oros, Special Agent (SA), and SA Tom Dooley, United States Environmental Protection Agency, Criminal Investigation Division (EPA-CID), Interviewed Allan "Brooks" Arruda (Arruda) regarding the removal of asbestos containing material from the roof of a heat treat oven at the Grede foundry, 242 S. Pearl Street, Berlin, Wisconsin. Arruda resides at ███████.

Arruda was met at the door of his residence, he was shown EPA CID credentials. He agreed to speak with the Agents and invited us into his home. He was notified that lying to Agents during the interview was a crime he could be prosecuted for, Arruda said he understood and the interview proceeded.

In summary and not verbatim, unless otherwise noted, Arruda provided the following information:

Arruda said he has he has approximately 30 years of experience working in foundries and that he started right out of high school. He said much of those 30 years he has known, work with, or worked for, Mitch Kidd (Kidd). He first met Kidd when he worked for Griffin Pipe in Florence, New Jersey. He also worked for Kidd at US Pipe and Atlantic States Pipe.

Arruda said he was contacted by Kidd and asked questioned about heat treat ovens while Kidd was employed at Grede's foundry in Berlin, Wisconsin. Kidd requested Arruda come to Berlin as a consultant to help rehabilitate a heat treat oven. The agreement he made with Kidd to consult on the rehabilitation of the heat treat oven included consulting fees and expenses to include housing and food. Arruda said there was no written contract with Grede, just a handshake agreement between Kidd and himself.

Arruda said the heat treat oven was old. He personally was on top of the heat treat oven at Grede a "million times" while consulting on the project. The project outlined by Kidd included new burners, brickwork, and work done to the flue and vents. He said the project was driven by Kidd and Steve O'Connell (O'Connell) was the Grede Plant Manager. He knows John Micheli (Micheli) and had spoken with him the morning of this interview about coatings which Arruda sells for professional Coating Technologies (PTC), Cedar Hill, Texas. He said that he spoke with Kidd two weeks prior to this interview. Neither Micheli nor Kidd

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

Case Number:

0500-0678

mentioned Agents might ask questions about the removal of asbestos insulation from the top of the heat treat oven. He also said he knew Angel Silva (Silva) who was also a Grede employee when he consulted on the heat treat oven.

Arruda had no employees of his own working for him while consulting at Grede. As part of the agreement made with Kidd Grede would provide the labor for whatever Arruda needed done. He said most of his communications regarding the heat treat oven were directly with O'Connell and Kidd. Arruda was shown invoice number 10648, he said that he didn't prepare the invoice. He said he sent a list of tasks he performed at Grede, as a result of his consultation, to his employer PCT who in turn prepared the invoice which was then submitted to Grede.

Arruda said PCT CFO Steve Maberry (Maberry) prepared the invoices. PCT allowed Arruda to work as a consultant for Grede rehabilitating the heat treat oven, even though Arruda was not selling PCT coatings, because Maberry knew Kidd from the industry and because PCT kept half of Arruda's fee. When asked about a February 5, 2012, email from Kidd to Arruda about needing an official invoice for the work Arruda performed Arruda said he didn't know why Kidd wrote what he wrote but that Kidd reviewed everything Arruda did.

Arruda was asked to review the invoice line by line which he appeared to do. He was asked to explain the line items that say "Clean off all debris from roof of oven;" and "pour/cast roof of oven with light weight castings". Arruda said he spoke with Kidd, O'Connell, and Silva and told them there were cracks in the brick refractory in the ceiling of the heat treat oven and that four inches of a light weight casting would need to be poured over the roof of the heat treat oven to seal the cracks. Arruda also told them before the casting could be poured the roof of the heat treat oven would need to be cleared of debris and insulation. He said he went to Kidd, O'Connell, and Silva because he needed manpower to remove the debris and insulation. Kidd told him anything he needed go through O'Connell and Silva.

Arruda said that he has had no formal training in what asbestos looks like but that he knows that it is found in pipe insulation, roofing materials, bricks and tiles and that his knowledge came from working in the foundry industry. He said asbestos is hazardous if it free in the air.

Arruda said that he was made to sign a piece of paper by an employee of Grede that he described as a really old white male (WM) whose name he couldn't recall. Arruda said the WM was the Director of Personnel for Grede's Berlin facility and thinks that he has likely retired due to his age at the time he signed the letter.

Arruda was shown a typed letter with PCT's name and address at the top, the body of the letter says "Scope of work performed was clean entire roof of oven and remove all dirt and brick debris no asbestos was present just normal foundry dirt and fire brick pieces." The letter has the typed name "Brooks Arruda" with a hand signed signature and date below that says Brooks Arruda and 1/12/12. Arruda reviewed the letter and identified the signature as his and said "no doubt" the date is written in his hand writing. He verified that this was the letter he was asked to sign by the Grede Personnel Director.

Arruda said he was asked to go to the Grede foundry office by Christy McNamee (McNamee) or another Grede Environmental Health and Safety employee whose name he didn't recall but described him as a white male (WM). When he was told he needed to go to the office, McNamee and the unknown WM appeared to be in a panic and that they insisted Arruda go to the office immediately.

Arruda was told to go to the Grede personnel office on or about the afternoon of 1/12/12, he had never been asked to go to the Grede office to meet with personnel staff prior to the removal. He said he was asked

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

what he saw on top of the heat treat oven and specify asked if he saw asbestos by the personnel Director. He said while he was asked questions the Director typed the letter Arruda signed. When the Director finished typing he asked Arruda to sign the letter if he agreed that he didn't see asbestos on top of the heat treat oven. Arruda said that insulation bricks that were loose on top of the heat treat oven were removed but that he was not at the foundry overseeing the work the night of the removal and he verified the works was done during the third shift.

Arruda said he signed the letter because he didn't know the insulation was asbestos and because he didn't want to get kicked off the job. He told the Director he couldn't recognize asbestos. When he signed the document he didn't recall seeing Professional Coating Technology's name and address typed at the top of the letter. He expressed surprise to see PCT's identified there and said that it wasn't PCT letter head. He said it was the first time in his life he was asked into an office to sign a letter and that he didn't tell Kidd or O'Connell about the letter.

Arruda reiterated that he communicated with Kidd, O'Connell and Silva that the insulation on top of the oven needed to be removed before pouring the casting. Heating and cooling of the oven created fisher cracks in the oven refractory brick. He said O'Connell said no asbestos tests were done. He described the insulation as white material that was "really old", lite weight, damaged, and approximately 6 inches by 9 inches bricks, he referred to the insulation as fire brick insulation. He said he told Kidd, O'Connell and Silva that the debris and insulation needed to be removed all the way down to the refractory brick.

Arruda said there was an afternoon meeting with Kidd, O'Connell, Silva, Micheli and Arruda about the debris and insulation removal and that O'Connell gave instruction to Silva to assemble labor. Silva invited Don Acorn (Alcorn) out for dinner. He described Alcorn as a "Spanish kid, tight with Angel". He said Alcorn came to dinner by himself, not with his wife. Arruda said he wasn't part of a discussion with Alcorn on performing the insulation removal and that the project, including the insulation removal, came up during many conversations when Arruda, O'Connell, Silva and Kidd met at night at the restaurant Alibi's.

Arruda said he was in meetings with Kidd, O'Connell, Silva, McNamee and Wayde Schwarz (Schwarz). He is 100% confident he was informed during one of those meeting that there was no asbestos associated with the heat treat oven prior to the debris and insulation being removed. He thought it was McNamee who said there was no asbestos and that he felt at ease based on McNamee, Grede's safety person, saying there was no asbestos. He had limited contact with Schwarz reiterating most of his conversations about the heat treat oven were directly with Kidd and O'Connell.

Arruda said after the insulation removal he had heard complaints from the workers that the insulation removed from the top of the heat treat oven was asbestos and that McNamee told him one brick of asbestos was found. At some point he was told Schwarz took samples and that they were negative for asbestos and that maybe that was why it was said during the meeting there was no Asbestos. He was contacted by McNamee approximately eight months after the removal and asked questions about the removal. After the debris and insulation was removed Arruda mixed and poured the casting over the roof of the heat treat oven. He said that he was not offered medical monitoring by Grede.

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.



**LABORATORIES**

2033 Heritage Park Drive, Oklahoma City, OK 7312 / (405) 755-7272 / Fax (405) 755-1264

Advanced Asbestos Removal, Inc.
1063 County Road FF
Oshkosh, WI 54904

Re:  QuanTEM ID 207908

QuanTEM appreciates the opportunity to provide analytical testing services to you.  Attached are your reports and other supporting documentation for the above referenced project.

Thank you for making QuanTEM your lab of choice. If you have any question concerning this or other reports please feel free to contact us at 800-822-1650.

We continually work to improve our service.  Help us out by providing feed back on your experience at www.QuanTEM.com.  Click on Service Survey and fill out the form.  We look forward to hearing from you.

Respectfully,
QuanTEM Laboratories, LLC.

 



2033 Heritage Park Drive / Oklahoma City, OK 73120 / (405) 755-7272 / Fax (405) 755-2058

## Polarized Light Microscopy Asbestos Analysis Report

| QuanTEM Lab No. | 207908 | Client: | Advanced Asbestos Removal, Inc. |
| Account Number: | B665 | | 1063 County Road FF |
| | | | Oshkosh, WI 54904 |

| Date Received: | 05/17/2012 | | |
| Received By: | Joanna Mueller | | |
| Date Analyzed: | 05/17/2012 | Project: | Grede Foundry |
| Analyzed By: | Sandy Baker | Project Location: | Berlin WI Heat Treat Center |
| Methodology: | EPA/600/R-93/116 | Project Number: | N/A |

| QuanTEM Sample ID | Client Sample ID | Composition | Color / Description | Asbestos (%) | | Non-Asbestos Fiber (%) | Non Fibrous | |
|---|---|---|---|---|---|---|---|---|
| 001 | 1A | Homogeneous | Tan Brick | Asbestos Not Present | | NA | Quartz CaCO3 | |
| 002 | 1B | Homogeneous | Tan Brick | Asbestos Not Present | | NA | Quartz CaCO3 | |
| 003 | 2A | Homogeneous | Brown Fire Brick | Asbestos Not Present | | NA | Quartz CaCO3 | |
| 004 | 2B | Homogeneous | Brown Fire Brick | Asbestos Not Present | | NA | Quartz CaCO3 | |
| 005 | 3A | Homogeneous | Brown Insulation | Asbestos Present Chrysotile | 8 | Glass Fiber | 90 | |
| 006 | 3B | Homogeneous | Brown Insulation | Asbestos Present Chrysotile | 2 | Glass Fiber | 90 | |
| 007 | 3C | Homogeneous | Brown Insulation | Asbestos Present Chrysotile | 8 | Glass Fiber | 90 | |

Unless otherwise noted, upon receipt the condition of the sample was acceptable for analysis.

QuanTEM is a NVLAP accredited TEM and PLM laboratory (Lab Code 101959-0). This report relates only to the specific items tested. NVLAP accreditation applies only to analysis performed utilizing EPA/600/M44-82-020 and EPA/600/R-93/116 methods. This report may not be used to claim product endorsement by NVLAP or any other agency of the US Government. This report may not be reproduced except in full, without the written approval of the laboratory.



2033 Heritage Park Drive / Oklahoma City, OK 73120 / (406) 755-7272 / Fax (405) 755-2058

## Polarized Light Microscopy Asbestos Analysis Report

| QuanTEM Lab No. | 207908 | | Client: | Advanced Asbestos Removal, Inc. |
| --- | --- | --- | --- | --- |
| Account Number: | B565 | | | 1063 County Road FF |
| | | | | Oshkosh, WI 54904 |

| Date Received: | 05/17/2012 | |
| --- | --- | --- |
| Received By: | Joanna Mueller | |
| Date Analyzed: | 05/17/2012 | Project: Grede Foundry |
| Analyzed By: | Sandy Baker | Project Location: Berlin WI Heat Treat Center |
| Methodology: | EPA/600/R-93/116 | Project Number: N/A |

| QuanTEM Sample ID | Client Sample ID | Composition | Color / Description | Asbestos (%) | | Non-Asbestos Fiber (%) | | Non Fibrous |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 008 | 4A | Homogeneous | Tan Brick | Asbestos Not Present | | NA | | Quartz CaCO3 |
| 009 | 4B | Homogeneous | Tan Brick | Asbestos Not Present | | NA | | Quartz CaCO3 |
| 010 | 4C | Homogeneous | Tan Brick | Asbestos Not Present | | NA | | Quartz CaCO3 |
| 011 | 5A | Homogeneous | Light Brown Insulation | Asbestos Present Chrysotile Actinolite/Tremolite | 10 <1 | Glass Fiber | 3 | Vermiculite CaCO3 |
| 012 | 6A | Homogeneous | Brown Insulation | Asbestos Present Chrysotile | 12 | NA | | Vermiculite CaCO3 |
| 013 | 7A | Homogeneous | Gray Insulation | Asbestos Not Present | | Glass Fiber Synthetic | 4 7 | Vermiculite CaCO3 |

Sandy Baker, Analyst

5/17/2012
Date of Report

Unless otherwise noted, upon receipt the condition of the sample was acceptable for analysis.

QuanTEM is a NVLAP accredited TEM and PLM laboratory (Lab Code: 101959-0). This report applies only to the specific items tested. NVLAP accreditation applies only to analysis performed utilizing EPA/600/M4-82-020 and EPA/600/R-93/116 methods. This report may not be used to claim product endorsement by NVLAP or any other agency of the US Government. This report may not be reproduced except in full, without the written approval of the laboratory.

**FIRE BRICK ENGINEERS COMPANY**

2400 South 43rd Street P.O. Box 341278
Milwaukee, Wisconsin 53234-1278

(414) 383-6000
FAX (414) 383-6731

SOLD TO:
GREDE II LLC - BERLIN
242 SO PEARL ST
BERLIN, WI    54923

SHIP TO:
SAME

JOB 12-194

| CUSTOMER ORDER NUMBER | SHIP VIA | | | | DATE SHIPPED | CUSTOMER NO. |
|---|---|---|---|---|---|---|
| 57638 | ROCK TRANSFER | | COLLECT | | 08/09/12 | CITBER |
| ORIGIN | | F.O.B. | | TERMS | | SALESMAN |
| MILWAUKEE | | SHIPPING POINT | | NET 30 DAYS | | 11 |

| QUANTITY | DESCRIPTION | MSDS | PRICE | UNIT | EXTENSION |
|---|---|---|---|---|---|
| 1. | LABOAR & MATERIAL TO COMPLETE HEAT TREAT FURNACE RELINE | | 132000.00 | EA | 132,000.00 |
| 1. | ADDITIONAL FOR LINING REMOVAL | | 3500.00 | EA | 3,500.00 |
| | | | TOTAL: | | 135,500.00 |

This Merchandise Produced, Sold and Delivered in Conformity with the Fair Labor Standards Act of 1938, as Amended & Applicable Orders and Regulations thereunder.

FBE0010

FIRE BRICK ENG_000012



**GREDE**
Casting integrity.

# Purchase Order .

Page 1

## Grede II LLC - Berlin
242 South Pearl St
Berlin, WI 54923

| | |
|---|---|
| ORDER NUMBER | 57638 |
| DATE | 7/19/12 |
| VENDOR NO. | 002780 |
| TERMS | Net 45 Days |
| SHIP VIA | ROCK TRANSFER |
| F.O.B. | Origin |

FIRE BRICK
2400 S. 43rd STREET
MILWAUKEE WI 53234-1278

This purchase order incorporates by reference the terms and conditions for Grede Purchase Orders in effect on the date hereof, as they may be amended or revised from time to time, and located on buyer's website at www.Grede.com ("Terms and Conditions"). This purchase order also incorporates by reference the Grede Supplier Quality Manual in effect on the date hereof, as it may be amended or revised from time to time, and located on buyer's website at www.Grede.com ("Supplier Quality Manual"). The terms and conditions and the supplier quality manual govern all purchases of material, goods and/or services by buyer from supplier. Supplier acknowledges receipt, review and acceptance of the terms and conditions and the supplier quality manual.

| ITEM | DESCRIPTION | QUANTITY | UM | UNIT PRICE | TOTAL PRICE |
|---|---|---|---|---|---|
| 1 | Labor and material to refine the heat treat oven #12-194B Capital project BER-2012-012<br><br>Due Date: 8/14/12   1.00<br><br>Packing slip must have our material number<br>All purchase must be shipped complete<br>Required acknowledgment on all purchase orders<br>Ship via unless otherwise indicated on this purchase order<br>All shipments must be shipped F.O.B destination<br>Fecx Ground is our first choice account #122855821<br>UPS Ground is our second choice account #594565<br>For transportation routing instructions please logon to<br>http://www.citation.net/suppliers-guides.html<br>Or contact Trans-man Logistics at 734-946-3000 Ext 123.<br>Failure to conform to the Routing Guide will result in a<br>Supplier CHARGEBACK FEE<br><br>***************SHIPPING NOTICES********************<br>UNLESS OTHERWISE INDICATED ON THIS PURCHASE ORDER, ALL SHIP-<br>MENTS MUST BE SHIPPED "FOB DESTINATION: FREIGHT COLLECT". | 1 | EA | 132000.0000 | 132000.00 |

Send Invoice To:

242 South Pearl Street
Berlin, Wisconsin 54923-2071

continue on next page

*Robert Behnke*

RRRFORB

FBE0011

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 13 of 113   Document 72-1

FIRE BRICK ENG_000013



**GREDE**
Casting Integrity.

# Purchase Order

Page 2

## Grede II LLC - Berlin
242 South Pearl St
Berlin, WI 54923

| | |
|---|---|
| ORDER NUMBER | 57638 |
| DATE | 7/19/12 |
| VENDOR NO. | 002780 |
| TERMS | Net 45 Days |
| SHIP VIA | ROCK TRANSFER |
| F.O.B. | Origin |

FIRE BRICK
2400 S. 43rd STREET
MILWAUKEE WI 53234-1278

This purchase order incorporates by reference the terms and conditions for Grede Purchase Orders in effect on the date hereof, as they may be amended or revised from time to time, and located on buyer's website at www.Grede.com ("Terms and Conditions"). This purchase order also incorporates by reference the Grede Supplier Quality Manual in effect on the date hereof, as it may be amended or revised from time to time, and located on buyer's website at www.Grede.com ("Supplier Quality Manual"). The terms and conditions and the supplier quality manual govern all purchases of material, goods and/or services by buyer from supplier. Supplier acknowledges receipt, review and acceptance of the terms and conditions and the supplier quality manual.

| ITEM | DESCRIPTION | QUANTITY | UM | UNIT PRICE | TOTAL PRICE |
|---|---|---|---|---|---|
| | ROUTING GUIDES CAN BE FOUND AT HTTP:\WWW.GREDE.COM FOR DETAILED SHIPPING INSTRUCTIONS. CALL ENGLAND LOGISTICS AT 734-946-3000 EXT 6032. FAILURE TO CONFORM TO THE ROUTING GUIDE WILL RESULT IN A SUPPLIER CHARGEBACK FEE<br>\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*<br>GREDE HAS REVISED ITS PURCHASE ORDER TERMS AND CONDITIONS AND HAS A SUPPLIER QUALITY MANUAL. PLEASE REVIEW THE PO HEADER ON EACH PAGE OF THIS DOCUMENT INCORPORATING THE REVISED PO TERMS AND CONDITIONS AND THE SUPPLIER QUALITY MANUAL. | | | | |
| | TOTAL | | | | |

TOTAL                                                    132000.00

Send Invoice To:
242 South Pearl Street
Berlin, Wisconsin 54923-2071

*Robert Behah*

FBE0012

*Fri*

*Aug* 

PO # 57638

Grede II LLC - Berlin
242 South Pearl Street
Berlin, WI 54923
Attention: Mr. Wade Schwarz

Proposal No. 12-194B FBC
July 18, 2012
Page 1 of 3
E-Mail: wschwarz@grede.com

## SUBJECT: CAR BOTTOM FURNACE (8 ½' x 10 ½' x 29')

In accordance with your request, Fire Brick Construction (FBC) Division is pleased to provide our quotation for Materials, Labor and Equipment to knockout and reline your Heat Treat Furnace.

### Scope of Work
1. Subcontract knockout of existing asbestos-containing Refractory Lining on Walls, Roof and Door.
2. Subcontract disposal of asbestos-containing Refractory in proper landfill.
3. Fabricate and install a new ¼" thick Flat Steel Roof.
4. Mobilize FBC Crew and Equipment to job site in Berlin, WI.
5. Install the following Lining:

~~Floor~~ Pyro Bloc 8# Density Y Modules R-Grade

### Jambs
½" Carafelt
18 ½" 45% AL Low Cement Castable
Held by S/S C Clips and Brick Anchors

### Lintel
12 ½" 45% AL Low Cement Castable Modules
Held by S/S C Clips and Brick Anchors

2 Boxes IC-FAS

### Lower Curb to 41" Height
5" Mineral Wool Board
12" 45% AL Low Cement Castable
Car Seal will be 22 ½" total thickness

### Upper Walls/Roof
12" Pyro Bloc 8# Density Y Modules R-Grade
Flues will be insulated with Riser Sleeves

6. Clean jobsite as a result of our operation and demobilize.

### Quotation Pricing
Total cost for Lining Removal...................................................$20,350.00
Total Steel Work Cost............................................................$29,175.00

Total Refractory Lining Cost with Metpump ASX-50 No Cement Castable including

Tools, Labor and Equipment...................................................$77,475.00

Additional cost of Labor & Equipment for a 48-hour Dryout for ASX-50 Lining
Is......................................................................................$5,000.00

Project Total Cost................$132,000.00

For cost
1273

(414) 383-6006 * Fax (414) 383-6731 * 2400 South 43rd Street * P.O. Box 341278 * Milwaukee, WI 532-9
(317) 247-1447 * Fax (317) 247-1145 * 5047 Dividend Rd , Ste. B * Indianapolis, IN 46241
(612) 721-3910 * Fax (612) 721-2446 * 3219 Snelling Avenue South * Minneapolis, MN 55406
(423) 827-0883 * Fax (423) 867-6162 * 4295 Cromwell Road #424 * Chattanooga, TN 37421

15 Flues
6" ID x 8' od

(* ADD. $3500
For using Robinson Bros)

Grede II LLC - Berlin
$135,500

15
x(2
3?
150/80

FBE0013

Proposal No. 12-194B FBC
Page 2 of 3

**Special Notes**
1. Validity: 60 Days
2. Labor is figured at one (1) 10-hour shift per day on a Monday to Sunday schedule. Any holidays or downtime not due to our own fault will be EXTRA.
3. Materials are F.O.B. Shipping Points FREIGHT COLLECT.
4. Steel work is figured on a Monday to Sunday schedule.
5. Knockout is figured on a Monday to Friday schedule.
6. No Material or Labor is figured for the Car.

**It is our understanding that GREDE II LLC - BERLIN and/or others will provide and/or perform the following:**
1. Remove/replace Door.
2. Install Steel onto Roof and Upper Walls if applicable.
3. Provide Burner Blocks.
4. Forklift, (8,000 lbs. minimum, 3 Mast) to unload/load Materials and Equipment and stage at jobsite. Exclusive use required during Casting, Pump Cast, Shotcrete and/or Gunite Installations.
5. Electricity within 30' of jobsite, (120V, 20 Amp; 240V, 30 Amp 3 phase; 480V, 20 Amp and 60 Amp, 3 phase) with skilled Electrician to perform proper connections.
6. Compressed Air within 30' of jobsite, (1" dia. Supply Line; 90 psi @ 185 cfm for Tear Out, Plastic Installation and Pump Cast; 100 psi @ 475 cfm for Gunite and Shotcrete Installation; 120 psi @ 750 cfm, - Plastic Gunite Installation).
7. Potable Water within 30' of jobsite, (0.75 dia. Minimum Supply Line, 20 gpm).
8. Sanitary facilities with Emergency First Aid Services.
9. Natural Gas Supply within 20' of each burner required, 2" dia. Supply Line @ 10 lbs. of pressure per line.
10. Removal/replacement of any wiring, meters, hydraulics, pneumatics that might become damaged during Dry Out and/or Heat Up.
11. Hoppers to place debris into and remove to a suitable dump site in accordance with EPA, Local, State and Federal Regulations and Standards.
12. Any and all Asbestos Abatement.
13. Any structural steel or shell repairs required with welding equipment and operator.
14. Confined space monitoring required and air testing along with one (1) competent person per shift for 'Hole Watch' to perform monitoring and perform required documentation.
15. Written Lock Out/Tag Out procedure for appropriate equipment and competent person to direct FBE personnel through LO/TO locations.

I look forward to discussing this proposal with you and the opportunity to service your refractory repair requirements.

Sincerely,

FIRE BRICK ENGINEERS COMPANY

*Adam Wood*
Adam Wood
Sales Representative

GREDE II LLC - BERLIN        7/19/12

Accepted by:
Name, Title & Date

FBE0014

FIRE BRICK ENG_000016



## TERMS & CONDITIONS

| | | |
|---|---|---|
| PRICES: | 1. | Prices quoted are subject to adjustment in order to conform to Seller's prices in effect on date of shipment. Prices specified do not include sales, excise or other taxes payable on account of this transaction, and all such taxes now in effect and/or hereafter levied which are applicable to this transaction are in addition to such prices and shall be paid by Buyer. |
| DELIVERY & SHIPMENT | 2. | Shipment will be made specified on the face hereof, but Seller shall in no event be liable for spotting, switching, demurrage or drayage charges at destination. The shipping promise shown is our best estimate based on present factory conditions. While we will make every effort to ship as near to this date as possible, we cannot guarantee the date of shipment. |
| DELAYS & PERFORMANCE | 3. | Seller shall not be liable for delay or failure of performance hereof arising from any cause not within Seller's reasonable control, including but not limited to, accidents to or breakdowns to, or mechanical failure of plant machinery or equipment arising from any cause whatsoever, strikes or other labor troubles, labor shortage, fire, flood, war, acts of public enemy, acts of God, priorities, allocation, limitations or other acts required by Federal, State or local Governments or any subdivision, bureau or agency thereof, or failure of usual sources of supply of materials. |
| SPECIAL MATERIALS | 4. | Orders for other than standard material, either in size or composition, are not subject to cancellation. |
| LIMIT | 5. | This quotation is firm for acceptance within thirty days of the date of the quotation. |
| TERMS | 6. | Thirty days net unless otherwise noted on our quotation. |
| TAXES | 7. | Taxes on our quotation, if applicable, are not included. Customer must furnish a Certificate of Exemption if taxes are not applicable. |
| WARRANTY | 8. | We guarantee that all work will be done in a competent manner and will be free from defects. We guarantee that all materials manufactured by Fire Brick Construction Division of Fire Brick Engineers Company will be free from defects and suitable for installation. It will be the responsibility of the purchaser to notify Fire Brick Construction Division of Fire Brick Engineers Company of any defects in workmanship or materials within six months after completion of the installation or the material purchase. Fire Brick Construction Division of Fire Brick Engineers Company will provide materials and/or labor to correct any deficiency. All corrections will be made on a prorated basis during a regular work week, at a time mutually agreeable to Fire Brick Construction Division of Fire Brick Engineers Company and the purchaser. Equipment and/or materials purchased by Fire Brick Construction Division of Fire Brick Engineers Company for this installation will carry the warranty extended to us by the manufacturer.<br><br>NOT INCLUDED UNDER WARRANTY – Normal wear and tear of materials and/or equipment, damage resulting from improper bake-out on the lining, damage resulting from explosions or abnormal service conditions, materials and/or equipment not manufactured by Fire Brick Construction Division of Fire Brick Engineers Company, damage resulting from failure of the rods, backstays or other retaining devices not installed by Fire Brick Construction Division of Fire Brick Engineers Company OR ANY OTHER CONSEQUENTIAL DAMAGES. |
| CANCELLATION | 9. | The purchaser may cancel any portion of sale or installation that has not been consummated. Cancellation charges for the sale or installation will include all costs expended by Fire Brick Construction Division of Fire Brick Engineers Company up to the date of cancellation. |
| EQUIPMENT | 10. | Changes made for mold, dies or other equipment, do not convey title or right to remove them from manufacturer's factory. |
| TRANSPORTATION | 11. | Any transportation charge shown in this quotation is for the purpose of determining the approximate delivered cost and unless otherwise specified, is based on present published rates. Transportation rates are subject to change without prior notice and any increase or decrease would be for Buyer's account. |

FBE0015

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 17 of 113   Document 72-1
FIRE BRICK ENG_000017

| Case Number | Case Title | |
|---|---|---|
| 12-C111-005 | Grede Wisconsin Subsidiaries, LLC | |
| **Activity** | | **Date of Activity** |
| David Stewart interview | | March 23, 2012 |

Narrative[1]

Environmental Warden Stefan Fabian and Conservation Warden Intern Karen Stoll stopped at the David Stewart residence on March 23, 2012 at approximately 2:33 P.M. The Stewart residence is located at 408 N. Townline Road, Wautoma, Wisconsin. The purpose of the visit was to discuss Stewart's knowledge of asbestos removal at the Grede Foundry in Berlin, Wisconsin. Fabian was investigating Grede Wisconsin Subsidiaries, LLC (Grede) for asbestos handling violations.

Fabian drove into the driveway and was greeted by a white male subject who identified himself as David Stewart. Fabian identified himself as an Environmental Warden with the Wisconsin Department of Natural Resources and presented his badge and credentials. Fabian prearranged the meeting. Stewart invited Fabian and Stoll into his residence to discuss the asbestos removal at the Grede Foundry.

> **David Stewart**
> **408 N. Townline Road**
> **Wautoma, WI 54982**
> **(920) 376-1943**

Stewart said that he works at the Grede Foundry in Berlin. He looked at his latest check stub which indicated the company's name was Grede Wisconsin Subsidiaries, LLC. Stewart said that the foundry gets sold to a new owner about every 5-7 years. Stewart said that before June of 2010 the foundry was owned by Citation Corporation.

Stewart said that one day during the second week of January 2012 Grede had its workers remove asbestos containing material without following any safety procedures. Stewart said that the removal lasted one day (January 8 or 9). Stewart said that the material removed was from the ceiling above the heat treat furnace in the fabrication/maintenance area. Stewart said that the material received water damage so the company wanted it removed. Stewart said that the area removed was about eight feet wide by thirty feet long. Stewart said that the asbestos containing material removed filled two boxes that each contained about 27 cubic feet and two dumpsters that contained about 20 cubic feet each. Stewart said that these containers sat in the facility for 3-4 days in a dry condition. Stewart said that the asbestos material was removed in a dry condition.

[1]

| Warden Reporting | Date of Report | Exhibit Reference |
|---|---|---|
| Stefan Fabian | March 29, 2012 | |

*This document was produced as a result of an official Law Enforcement investigation. Contents, in whole or part, are privileged by s. 905.09, Wis. Stats., and may not be used without express permission of the Wisconsin Warden service or appropriate prosecutor.*

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 18 of 113   Document 72-1      DNR_000253

Stewart said that Kelly Harmsen, Forrest Woiak, and Mike Werch were the Grede employees that did the actual removal of the asbestos. Stewart said that once the removal was done, Paul Sitter instructed them to use the super sucker to clean up the mess created from the removal. Stewart said that the super sucker is a motor driven vacuum cleaner without any filters. Stewart said that the super sucker caused the asbestos dust to be projected across the entire fabrication bay as well as other bays where Stewart and other employees were working. Stewart said that he reported the incident to the Wisconsin Department of Natural Resources. Stewart said that Air Management Specialist Jessica Fournier came out to the foundry and took some samples of the waste along the edge of the heat treat furnace. Stewart said that Fournier didn't sample the material in question. Stewart said that all of Fournier's sample results came back as not containing asbestos. Stewart said that he called Fournier and told her that she needed to go back to Grede and sample the material that was removed from above the heat treat furnace. Stewart said that he collected a sample of the suspected asbestos containing material and sent it in to a lab for testing. He said that he purchased an asbestos sampling kit from Ace Hardware and sent it into Pro Lab. He said that his sample came back 10% asbestos.

Stewart said that Fournier returned to Grede and took additional samples. Stewart said that her second round of samples indicated that the material contained 10% asbestos. Stewart said that Fournier split samples with Wade Schwartz (Grede Safety Director).

Stewart said that Mark Duginski (maintenance supervisor), Don Alcorn, and Tony Licterman (engineer) are all aware of the asbestos removal project. Stewart said that Jim Robbins has photos of the asbestos material on his phone. Stewart said that Kelly Harmsen also took a sample of the suspected asbestos containing material.

Stewart said that Peter Mark, the corporate safety officer, came to the foundry and gave a presentation to the employees about the asbestos removal incident. Stewart said that Mark told the employees that the DNR came to the foundry and found 1 tiny brick that contained asbestos. Stewart said that Mark told them that the DNR signed off on how Grede handled the material. Stewart said that after the presentation, Mark met with Dan Bloede (the union president), and Stewart. Stewart said that Mark told them that that the incident wouldn't have been handled like it was if Mark was responsible for the asbestos removal. Stewart said that Harmsen has a sample of the material in question and gave some of it to Mark.

Stewart then gave Fabian the remaining material that he had taken as a sample that hadn't been sent in to Pro Lab. The material was enclosed in two plastic bags (double bagged). Fabian provided Stewart a copy of his business card and thanked him for his time. Fabian and Stoll left the residence at approximately 4:00 P.M.

DNR_000254



NEIC DOCS_000043



Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 21 of 113   Document 72-1

NEIC DOCS_000047

**Case Number:**
0500-0678

**Case Title:**
Grede Foundry

**Subject of Report:**
David Stewart

**Reporting Official and Date:**
William M. Oros Jr.
Special Agent
*20-MAY-2016, Signed by: William M. Oros Jr.*

**Reporting Office:**
Chicago, IL, Area Office

**Activity Date:**
May 11, 2016

**Approving Official and Date:**
Jeffrey D. Martinez
Special Agent in Charge
*20-MAY-2016, Approved by: Eric S. Hann*
*Acting Assistant Special Agent in Charge*

### SYNOPSIS

Stewart said he knew Grede didn't test the top of the heat treat oven for asbestos because the sample results he was shown by Christy McNamee (McNamee), and that McNamee posted for all employees to see, was for brick not the fibrous material that Grede employees were removing from the top of the oven. He said that he worked in the building trades and that he knew the difference between brick and the material he had observed removed from the top of the oven.

### DETAILS

On May 11, 2016, this Reporting Agent (RA) Will Oros, Special Agent, United States Environmental Protection Agency, Criminal Investigation Division (EPA-CID), spoke with David Stewart (Stewart) regarding the removal of asbestos containing material from the roof of a heat treat oven at the Grede foundry 242 S. Pearl Street, Berlin, Wisconsin. Stewart resides at 2681 NW Elm lane, Madras, Oregon, 97741; Cellular number 541-350-7425.

In summary and not verbatim, unless otherwise noted, Stewart provided the following information:

Stewart was previously interviewed by Wisconsin DNR Warden, Stefan Fabian. He has since moved to a different residence and changed telephone numbers.

Stewart said he knew Grede didn't test the top of the heat treat oven for asbestos because the sample results he was shown by Christy McNamee (McNamee), and that McNamee posted for all employees to see, was for brick not the fibrous material that Grede employees were removing from the top of the oven. He said that he worked in the building trades and that he knew the difference between brick and the material he had observed removed from the top of the oven.

Stewart said he was shown the fibrous brick material by employees working on the oven and suspected it was asbestos. He said he showed it to, who he described as a "German guy" who told him that based on the age of the oven that it was 99% likely what was being removed was asbestos. The man he was referring to be had an accent and he believed was German and he didn't recall his name. He said the individual was very knowledgeable in the operation of the heat treat oven.

Stewart said he followed up his conversation with the German guy by speaking to McNamee and asking to see the sample results. He said that when she showed him the results he notified her what she was showing him was for brick material not the fibrous material that was being removed from the top of the oven by Grede employees. He said McNamee dismissed him stating that Grede had everything tested.

Stewart then took samples and pictures of the material removed from the top of the oven that was put in 4 to 5 large boxes that had the Grede name on them. He said that when he got the laboratory results back for the samples he collected from the boxes he called the laboratory to ask what the results meant. He was told that

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 22 of 113   Document 72-1
REPORTS AND ATT_000289

**Case Number:**
0500-0678

the amount of asbestos contained in the sample was really high. He said that he observed Grede employees shoveling the material off the top of the oven onto the ground below and that they were not wearing repertory protection.

Stewart said that he had to walk through the area where the removal of material from the top of the oven was occurring and that the work created a lot of dust. He described the dust as if you were following behind a car on a dirt road. He said that when he was in the area he didn't recall any bay doors being opened.

Stewart said he reported the removal to the Wisconsin DNR, he told McNamee, and that he openly discussed his observations during a foundry meeting lead by Peter Mark (Mark). He said at the beginning of the meeting Mark introduced himself as a new safety person for Grede and that the meeting occurred approximately 2 months after the removal was performed by Grede employees. He said he didn't recall signing anything as if it were training and that the meeting was just a company meeting, not training.

Stewart said during the meeting Mark minimized the removal of asbestos from the heat treat oven as a little incident and that it was a minimal asbestos exposure and there was nothing to worry about. He said he was upset by Mark's minimization so he spoke up and described publicly what he had observed to include the removal of material from the top of the oven and notified Mark publicly that there was still evidence of the removal around the oven. He said Mark told him that he hadn't heard about the removal of material from the top of the oven as Stewart described. Mark asked a middle age while male, whose name Stewart didn't recall, to accompany Stewart to the oven to observe what Stewart was talking about so Mark could follow up.

Stewart said that during another company meeting it was mentioned that there were correspondence being sent to McNamee or being passed around talking about the removal of asbestos from the heat treat oven. He said the general manager at the time told the employees to stop sending the correspondence and harassing McNamee. He initially said he didn't know who wrote the correspondence but on May 12, 2016, he notified this RA that he had written the correspondence. He said he couldn't remember who the General Manager was but know it was not Mitch Kidd (Kidd).

Stewart said that he was clear with McNamee when he spoke with her about the fibrous material that it was being shoveled off the top of the oven and that most of the work he observed was being done on the outside of the oven.
Stewart said that he educated himself on what asbestos was and what amounts are dangerous. He said it upset him that Grede minimized the removal and exposure and that the DNR's and OSHA's response was not more significant. He said that he spoke with Union President, Dan Bloede (Bloede), even giving him a sample of what he collected from the boxes but that Bloede took a back seat on the issue.

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.



Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 24 of 113   Document 72-1

DAVE STEWART_000010



**PRO-LAB®**

The
**Professional's Choice**
**"Environmental Testing"**
1675 North Commerce Parkway, Weston, Florida 33326
Tel: (954) 384-4446   Fax: (954) 384-4838

DAVID STEWART
408 N TOWNLINE RD
WAUTOMA, WI 54982

# Certificate of Bulk Asbestos Analysis

| | |
|---|---|
| Prepared for: | DAVID STEWART |
| Phone Number: | (920) 376-1943 |
| Fax Number: | |
| Email Address: | hearthart2010@yahoo.com |
| Test Location: | |
| | HEAT TREAT FURNACE |
| | , |
| Report Number: | 020812-0661 |
| Date Sampled: | |
| Date Analyzed: | Feb 13, 2012 |
| Report Date: | Feb 14, 2012 |

John D. Shane Ph.D., QA/QC Manager

ytical results and reports generated by PRO-LAB/SSPTM, Inc. are generated for and at the request of its client(s)
ed on this report, and for their exclusive use. PRO-LAB/SSPTM, Inc. does not release original, copies or verbal
its to any third party without prior written approval from the named client(s). This report applies only to the
ale(s) tested. This report must not be reproduced, except in full, without written approval from PRO-LAB/SSPTM, Inc.
client(s) is solely responsible for the use and interpretation of test results and reports requested from
-LAB/SSPTM, Inc. This report must not be used by the client to claim product endorsement by NVLAP, NIST or any
r agency of the U.S. Government. PRO-LAB/SSPTM, Inc. is not able to assess the degree of hazard resulting
materials analyzed. PRO-LAB/SSPTM, Inc. reserves the right to dispose of all samples after a period of thirty
days, according to all state and federal guidelines, unless otherwise requested. Asbestos samples from New York
analyzed by Environmental Hazards Services, LLC, NY ELAP #11714.

**NVLAP®**
NVLAP Lab Code 200780-0

**If you have questions or comments, please contact PRO-LAB at (954) 384-4446**



# BULK ASBESTOS ANALYSIS

1675 North Commerce Parkway, Weston, FL 33326    (954) 384-4446

**PREPARED FOR**
DAVID STEWART
408 N TOWNLINE RD
WAUTOMA, WI 54982

| | |
|---|---|
| **CHAIN OF CUSTODY #:** | 555632 |
| **TEST ID NUMBER:** | 020612-0661 |
| **SAMPLING DATE:** | |
| **DATE RECEIVED:** | Feb 8, 2012 |
| **DATE ANALYZED:** | Feb 13, 2012 |
| **REPORT DATE:** | Feb 14, 2012 |
| **SAMPLE LOCATION:** | HEAT TREAT FURNACE |
| **COLOR / DESCRIPTION:** | TOP OUTER INSULATION |
| **SERIAL #** | |

**TEST LOCATION**

HEAT TREAT FURNACE

**SAMPLE LAYER:**    1

All percentages are visually estimated by volume

## ASBESTOS FIBERS

| | |
|---|---|
| Chrysotile: | 10% |
| Amosite: | ND |
| Crocidolite: | ND |
| Anthophyllite: | ND |
| Tremolite: | ND |
| Actinolite: | ND |

## NON-ASBESTOS FIBERS

| | |
|---|---|
| Synthetics: | ND |
| Mineral Wool: | 80% |
| Fiberglass: | ND |
| Cellulose: | ND |
| Animal Hair: | ND |
| Antigorite: | ND |

## NON-FIBROUS MATERIALS

| | |
|---|---|
| Vermiculite: | ND |
| Biotite: | ND |
| Mica: | ND |
| Perlite: | ND |
| Aggregates: | ND |
| Styrofoam: | ND |

## OTHERS

| | |
|---|---|
| Aluminum: | ND |
| Bitumen: | ND |
| Resilient Material: | ND |
| Glue: | ND |
| Binders: | 10% |

## COMMENTS:

The EPA requirement for analyzing and reporting Asbestos is as follows: A substance that contains less than 1% is not considered to have asbestos even though this may still contain traces of asbestos (just less than 1%). For further information please visit the EPA website at www.epa.gov/iaq/asbestos.html

Note: Limit of Quantification (LOQ) = 1%. 'Trace' indicates the presence of asbestos below the LOQ. 'ND'=None Detected. Any sample with a result of <1% will be point counted. The LOD of point counts is 0.25%.

Andrew Pittman, PLM Analyst          John D. Shane Ph.D., QA/QC Manager          NVLAP Lab Code 200790-0

All analyses are performed in accordance with the EPA 600/M4-82-020 method. This report must not be reproduced except in full, without written approval from PRO-LAB/SSPTM, Inc. These test results apply only to the samples actually tested. Floor tile is non-homogeneous and results reflect sample content. All samples will be stored for a period of thirty (30) days. The refractive index was determined by using 'Rapidly and Accurately Determining Refractive Indices of Asbestos Fibers by Using Dispersion Staining Method', by S-C. Su. The information contained in this report and any attachments is confidential information intended only for the use of the individual or entities named above. This report must not be used by the client to claim product endorsement by NVLAP, NIST or any other agency of the U.S. Government.          Page 2 of 2

**PRO-LAB**

COC # 555642

RESET

Print Screen

STATS | Detail Info | Testing | Print Report | Customer | Processing State | FAQ | Search | RADON

**Account Code**

Credit Card Number

☐ Credit Card On File

Check #

Billing CC CHARGE CAPTURED $46.00 - AUTH: 028039 >
Notes 2/9/12 3:03 PM ANALIA CASTANO

Amount: 46.00

**CHAIN OF CUSTODY/CONTACT INFORMATION** (Please Print clearly)

Company/Branch
STEWART

Contact

Phone:
920-376-1943

Address:
40NN TOWNLINE RD

Fax:

**Report Delivery:** ☐ FAX ☑ EMAIL ☐ MAIL

Email:
hearthart2010@yahoo.com

**Report Type:** ⊙ Standard ○ Detailed

City
WAUTOMA

State
WI

Zip
54982

**TEST LOCATION INFORMATION**

Property Name
DAVID STEWART

Sampling Date: ☑ 1 / 9 /2012

Address:
40N N TOWNLINE RD

State
WI

City
WAUTOMA

RH % 0

Temp F:

**Test Location = Customer Address**

Zip (Required)
54982

Receiving Email: ☑

PRO LAB DOCS_000004

| Case Number | Case Title | |
|---|---|---|
| 12-C111-005 | Grede Wisconsin Subsidiaries, LLC | |
| Activity | | Date of Activity |
| David Stewart interview | | March 23, 2012 |

Narrative[1]

Environmental Warden Stefan Fabian and Conservation Warden Intern Karen Stoll stopped at the David Stewart residence on March 23, 2012 at approximately 2:33 P.M. The Stewart residence is located at 408 N. Townline Road, Wautoma, Wisconsin. The purpose of the visit was to discuss Stewart's knowledge of asbestos removal at the Grede Foundry in Berlin, Wisconsin. Fabian was investigating Grede Wisconsin Subsidiaries, LLC (Grede) for asbestos handling violations.

Fabian drove into the driveway and was greeted by a white male subject who identified himself as David Stewart. Fabian identified himself as an Environmental Warden with the Wisconsin Department of Natural Resources and presented his badge and credentials. Fabian prearranged the meeting. Stewart invited Fabian and Stoll into his residence to discuss the asbestos removal at the Grede Foundry.

**David Stewart**
**408 N. Townline Road**
**Wautoma, WI 54982**
**(920) 376-1943**

Stewart said that he works at the Grede Foundry in Berlin. He looked at his latest check stub which indicated the company's name was Grede Wisconsin Subsidiaries, LLC. Stewart said that the foundry gets sold to a new owner about every 5-7 years. Stewart said that before June of 2010 the foundry was owned by Citation Corporation.

Stewart said that one day during the second week of January 2012 Grede had its workers remove asbestos containing material without following any safety procedures. Stewart said that the removal lasted one day (January 8 or 9). Stewart said that the material removed was from the ceiling above the heat treat furnace in the fabrication/maintenance area. Stewart said that the material received water damage so the company wanted it removed. Stewart said that the area removed was about eight feet wide by thirty feet long. Stewart said that the asbestos containing material removed filled two boxes that each contained about 27 cubic feet and two dumpsters that contained about 20 cubic feet each. Stewart said that these containers sat in the facility for 3-4 days in a dry condition. Stewart said that the asbestos material was removed in a dry condition.

| Warden Reporting | Date of Report | Exhibit Reference |
|---|---|---|
| Stefan Fabian | March 29, 2012 | |

*This document was produced as a result of an official Law Enforcement investigation. Contents, in whole or part, are privileged by s. 905.09, Wis. Stats., and may not be used without express permission of the Wisconsin Warden service or appropriate prosecutor.*

Stewart said that Kelly Harmsen, Forrest Woiak, and Mike Werch were the Grede employees that did the actual removal of the asbestos. Stewart said that once the removal was done, Paul Sitter instructed them to use the super sucker to clean up the mess created from the removal. Stewart said that the super sucker is a motor driven vacuum cleaner without any filters. Stewart said that the super sucker caused the asbestos dust to be projected across the entire fabrication bay as well as other bays where Stewart and other employees were working. Stewart said that he reported the incident to the Wisconsin Department of Natural Resources. Stewart said that Air Management Specialist Jessica Fournier came out to the foundry and took some samples of the waste along the edge of the heat treat furnace. Stewart said that Fournier didn't sample the material in question. Stewart said that all of Fournier's sample results came back as not containing asbestos. Stewart said that he called Fournier and told her that she needed to go back to Grede and sample the material that was removed from above the heat treat furnace. Stewart said that he collected a sample of the suspected asbestos containing material and sent it in to a lab for testing. He said that he purchased an asbestos sampling kit from Ace Hardware and sent it into Pro Lab. He said that his sample came back 10% asbestos.

Stewart said that Fournier returned to Grede and took additional samples. Stewart said that her second round of samples indicated that the material contained 10% asbestos. Stewart said that Fournier split samples with Wade Schwartz (Grede Safety Director).

Stewart said that Mark Duginski (maintenance supervisor), Don Alcorn, and Tony Licterman (engineer) are all aware of the asbestos removal project. Stewart said that Jim Robbins has photos of the asbestos material on his phone. Stewart said that Kelly Harmsen also took a sample of the suspected asbestos containing material.

Stewart said that Peter Mark, the corporate safety officer, came to the foundry and gave a presentation to the employees about the asbestos removal incident. Stewart said that Mark told the employees that the DNR came to the foundry and found 1 tiny brick that contained asbestos. Stewart said that Mark told them that the DNR signed off on how Grede handled the material. Stewart said that after the presentation, Mark met with Dan Bloede (the union president), and Stewart. Stewart said that Mark told them that that the incident wouldn't have been handled like it was if Mark was responsible for the asbestos removal. Stewart said that Harmsen has a sample of the material in question and gave some of it to Mark.

Stewart then gave Fabian the remaining material that he had taken as a sample that hadn't been sent in to Pro Lab. The material was enclosed in two plastic bags (double bagged). Fabian provided Stewart a copy of his business card and thanked him for his time. Fabian and Stoll left the residence at approximately 4:00 P.M.

DNR_000254

# Analytical Laboratory Report

April 25, 2012

Report ID:    9504949

STEFAN FABIAN
WI DNR AIR BULK ASBESTOS SAMPLE
2984 SHAWANO AVE
GREEN BAY WI 54313

Company Number:    32494

GREDE WISCONSIN SUBSIDARIES, LLC

PO# NMB00000078

Date Collected:    3/23/2012
Date Received:    4/5/2012
Date Reported:    4/25/2012

Analyst:

JOHN KNIGHT, Senior Chemist
jk@mail.slh.wisc.edu

Reviewer:

LEROY DOBSON, Chemist Supervisor
ld@mail.slh.wisc.edu

WOHL uses only verified, secured electronic signatures on reports.
These signatures are as valid as original handwritten signatures.

If you have any questions regarding this report please feel free to contact the
laboratory via email (as listed above) or via telephone at 800-446-0403

Report ID: 9504949

Page 1 of 4

DNR_000498

# Analytical Results

| B NUMBER LD NUMBER | DESCRIPTION | AIR VOLUME |
|---|---|---|

**26697**      DARK GRAY FIBROUS

**Bulk Asbestos**              ASBESTOS DETECTED

**Chrysotile Asbestos**        PRESENT

**COMMENTS:** 2.75% CHRYSOTILE ASBESTOS (By 400-POINT COUNT METHOD), 90% glass mineral wool, & binder. /// (Analysis Date: 4/25/12)

**26698**      LT TAN GRANULAR / DK GRAY FIBROUS

**Bulk Asbestos**              ASBESTOS DETECTED

**Chrysotile Asbestos**        PRESENT

**COMMENTS:** Lt TAN GRANULAR: 12.75% CHRYSOTILE ASBESTOS (By 400-POINT COUNT METHOD), in a mineral grain matrix. / Dk GRAY FIBROUS: 100% glass mineral wool.

Displayed values on report have been rounded; however all calculations are performed using raw, unrounded intermediate results. Please contact the laboratory if you have any questions regarding our result calculation or rounding. All samples were received by the laboratory in acceptable condition unless otherwise noted.

JOHN KNIGHT, Senior Chemist        04/25/2012   Date

31
Case 1:17-cr-00050-WCG Filed 06/12/17 Page 31 of 113 Document 72-1     DNR_000499

# Analytical Methodology

**BULK ASBESTOS BY PLM, METHOD WA001blk:**
The analytic method used for analysis was WOHL Method WA001blk.12 BULK ASBESTOS BY PLM. If Point counting was done then WOHL method WA002blk.10 was used. This method is based upon EPA-600/M4-82-020, "Interim Method for the determination of Asbestos in Bulk Insulation Samples", 40 CFR, Part 763, Subpart E, Appendix E, and associated EPA clarifications. Based upon this method, sample results are reported for each layer analyzed. Samples which contain >1% asbestos are regulated as asbestos containing materials.

Samples are initially examined with a low power stereomicroscope. An initial estimation of the type/percent asbestos (if present) is made. A small portion of each sample (or of each layer) is mounted on a glass slide in a few drops of Cargill high dispersion RI oil. The mounted sample is then analyzed using a Polarized Light Microscope at magnifications ranging between 20X-400X. Positive identification of any asbestiform minerals present is done using a 10X Dispersion Staining objective, and measuring other specific identifying optical properties. If an asbestiform mineral is detected in a sample, its' quantity is determined either by calibrated visual estimation or by Point Counting. There are six regulated asbestos minerals which may be present. These varieties are: Chrysotile, Amosite, Tremolite, Actinolite, Crocidolite and Anthophyllite.

If the final value = ND then no asbestiform minerals were detected in the sample.

Special note regarding floor tiles:
Because some floor tiles have been shown to contain significant amounts of asbestos which may be undetectable by standard PLM analysis, we recommend additional analysis using a Transmission Electron Microscope method. This method requires special sample preparation techniques beyond what is usually found with the standard PLM method.

Instrumentation:

The instruments used may include the following: Nikon SMZ-1B low power stereomicroscope; Nikon Optiphot polarizing light microscope equipped with a 10x dispersion staining objective, 2x, 10x and 20x pol objectives.

Quantitation Limit: 1% asbestos by visual estimation and 0.25% by 400 point count.

Quality control performed as required by AIHA (American Industrial Hygiene Association). Samples are retained for a period of 3 years before disposed of by laboratory unless prior arrangements have been made.

JOHN KNIGHT, Senior Chemist                    04/25/2012
                                               Date

## End of Analytical Report

The results in this report apply only to the samples, specifically listed above, tested at the Wisconsin Occupational Health Laboratory .
This report is not to be reproduced except in full.

JOHN KNIGHT, Senior Chemist                    04/25/2012
                                                    Date

DNR_000501

# Wisconsin Department of Natural Resources
## Laboratory Report

**Laboratory:**  Wisconsin State Laboratory of Hygiene          **DNR ID** 113133790
2601 Agriculture Dr
Madison          WI     53718
*Phone :* 800-442-4618     *Fax Phone :* 608-224-6213

## Sample:

| | | |
|---|---|---|
| Field #: | 1 | Sample #: 1526697 |
| Collection Start: | 03/23/2012 12:00 am | Collection End: |
| Collected by: | STEFAN FABIAN | Waterbody/Outfall Id: |
| ID #: | 1526697 | ID Point #: |
| County: | | Account #: 32494 |
| Sample Location: | PO# NMB00000078 | |
| Sample Description: | | |
| Sample Source: | Other | Sample Depth: |
| Date Reported: | 04/25/2012 | Sample Status: COMPLETE |
| Project No: | | Sample Reason: |

## Analyses and Results:

| Analysis Method | | Analysis Date | Lab Comment | | | |
|---|---|---|---|---|---|---|
| Lab Memo | 2.75% CHRYSOTILE ASBESTOS (By 400-POINT COUNT METHOD), 90% glass mineral wool, & binder. /// (Analysis Date: 4/25/12) | | | | | |

| Code | Description | Result | Units | LOD | Report Limit | LOQ |
|---|---|---|---|---|---|---|
| 99746 | ASBESTOS, BULK | *ASBESTOS DETECTED | % | | | |
| 99802 | ASBESTOS, CHRYSOTILE (BULK) | *PRESENT | % | | | |

# Wisconsin Department of Natural Resources
## Laboratory Report

**Laboratory:**    **Wisconsin State Laboratory of Hygiene**        *DNR ID*   113133790
           **2601 Agriculture Dr**
           **Madison**      **WI**    **53718**
           *Phone :*   **800-442-4618**     *Fax Phone :* **608-224-6213**

## Sample:

| | |
|---|---|
| *Field #:* **2** | *Sample #:* **1526698** |
| *Collection Start:* **03/23/2012 12:00 am** | *Collection End:* |
| *Collected by:* **STEFAN FABIAN** | *Waterbody/Outfall Id:* |
| *ID #:* **1526698** | *ID Point #:* |
| *County:* | *Account #:* **32494** |
| *Sample Location:* **PO# NMB00000078** | |
| *Sample Description:* | |
| *Sample Source:* **Other** | *Sample Depth:* |
| *Date Reported:* **04/25/2012** | *Sample Status:* **COMPLETE** |
| *Project No:* | *Sample Reason:* |

## Analyses and Results:

| Analysis Method | | | Analysis Date | Lab Comment |
|---|---|---|---|---|
| Lab Memo | Lt TAN GRANULAR: 12.75% CHRYSOTILE ASBESTOS (By 400-POINT COUNT METHOD), in a mineral grain matrix. / Dk GRAY FIBROUS: 100% glass mineral wool. | | | |

| Code | Description | Result | Units | LOD | Report Limit | LOQ |
|---|---|---|---|---|---|---|
| 99746 | ASBESTOS, BULK | *ASBESTOS DETECTED | % | | | |
| 99802 | ASBESTOS, CHRYSOTILE (BULK) | *PRESENT | % | | | |

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 35 of 113   Document 72-1     DNR_000503

# WISCONSIN OCCUPATIONAL HEALTH LABORATORY (WOHL) SAMPLE SUBMISSION FORM

**Bill To** _____

**Project** CLEEE Wisconsin Subsidence LLC

**P.O. #** 32,494

**Turnaround:** ☐ **RUSH** ☐ **PRIORITY** ☒ **NORMAL**
{ must be prearranged }

**WOHL COMP#** _____

**Phone #** (920) 682-5743

**FAX #** (920) 662 - 5413

**Email Address** John.Froehm @ wisconsin.gov

**Date Sampled** 3/23/12

**Send Results To ATTN:** John Froehm

WDNR
2984 Shawano Ave
Green Bay, WI 54313

SPECIAL INSTRUCTIONS

### ∅ PLEASE GROUP SAMPLES BY MEDIA USED AND ANALYSIS REQUESTED. ∅

| LAB USE ONLY WOHL SAMPLE # | CUSTOMER FIELD # | SAMPLE MEDIA | WIPE SAMPLES SIZE OF AREA WIPED EX: 2 IN x 2 IN | AIR SAMPLES | | | | SAMPLES ONLY | | ANALYSIS REQUEST |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | FOR TIME ON | TIME OFF | TOTAL TIME (MINS) | FLOW RATE (L/MIN) | VOLUME (LITERS) | | |
| | 1 | | | | | | | | | ASBESTOS [ STEWART ] |
| | 2 | | | | | | | | | AS BESTOS [ THOMPSON ] |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

**CHAIN OF CUSTODY: Relinquished** [signature]

**UPS, Fed-Ex & Other Shippers**
Wisconsin Occupational Health Lab
2601 Agriculture Drive
Madison, WI 53718

**US Postal Service**
Wisconsin Occupational Health Lab
PO Box 7996
Madison, WI 53707-7996

**Date** 4/5/12

**Phone** 608 224-6210
800 446-0403

**FAX** 608 224-6213

**Received** [signature]

**Date** of 5 12

**Sampling Questions**
WOHLsampling@mail.slh.wisc.edu
**Web Page/Order Media**
http://www.slh.wisc.edu/wohl

SAMPLE CONDITION
☒ OK ☐ NOT OK

**State of Wisconsin**
**Department of Natural Resources**

**Chain of Custody Record**
Form 4100-145 (R 3/08)

Sample Collector(s) Name: STEPH~ FREITAN

Property Owner: GILBERT WATERMAN

Return Report As: (select one) ☒ Email ☐ Hard Copy

Email or Postal Address: STEPH~. FREITAN @ WISCONSIN . GOV

Property Address: WATERMAN SWINEWORKER, LLC

Phone Number (include area code): (920) 662-5443

Phone Number (include area code)

Split Samples: Offered? ☐ Yes ☒ No    Accepted? ☐ Yes ☒ No    Accepted By (Signature):

| Field ID No. | Date | Time | No. of Containers | Station Location / Sample Description | Lab ID Number | Cracked / Broken | Improperly Sealed | Good Condition | Other Comments |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 3/23/12 | 3:00 pm | 1 | ASBESTOS FROM SAMPLE RECEIVED | | | | | |
| 2 | 4/3/12 | 6:25 pm | 1 | ASBESTOS FROM KARLA SAMPLE STEINHOT RECEIVED WORKASGEN | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Lab Use Only

**Method of Shipment:**
☒ Staff
☐ U.S. Postal Service
☐ UPS
☐ FedEx
☐ Other–specify:

**Reason for Sample Collection:**
☐ Anhydrous Ammonia Spill
☐ Animal Waste
☐ Open Burning
☐ Dairy Product Spill
☐ Construction/Storm Water Runoff
☐ Pesticide Spill * – Specify Pesticide: _____
☐ Hazardous Waste Release *
☐ Petroleum Product Release * – Specify Product: _____
☐ Industrial Spill/Runoff * – Specify Industry Type: _____
☒ Other – Specify: ASBESTOS

* Contact the laboratory with product information and for consultation. Also, include sample of suspected spilled product.

Was the sample shipping container sealed on receipt? ☐ Yes ☐ No

I hereby certify that I received and properly handled these samples as noted below.

| Relinquished By (Signature) | Date / Time | Received By (Signature) | Date / Time |
|---|---|---|---|
| [signature] | 4/3/12 8:30pm | | |
| Relinquished By (Signature) | Date / Time | Received By (Signature) | Date / Time |
| Relinquished By (Signature) | Date / Time | Received for Laboratory By (Signature) | Date / Time |

Disposition of Unused Portion Sample:
☐ Dispose
☐ Return
☐ Retain until further notice
☐ Other _____

If you need additional room for notes, use the back of this form.

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 37 of 113   Document 72-1     DNR_000505

| Case Number | Case Title |
| --- | --- |
| 12-C111-005 | Grede Wisconsin Subsidiaries, LLC |

| Activity | Date of Activity |
| --- | --- |
| Kelly Harmsen interview | April 3, 2012 |

Narrative[1]

Environmental Warden Stefan Fabian stopped at the Kelly Harmsen residence on Tuesday, April 3, 2012 at approximately 5:00 P.M. The Harmsen residence is located at 241 W. Moore Street, Berlin, Wisconsin. The purpose of the visit was to discuss Harmsen's knowledge of the removal of insulation from the heat treat oven in January 2012 at the Grede Wisconsin Subsidiaries, LLC (Grede) foundry. The foundry is located at 242 S. Pearl Street, Berlin, Wisconsin. Fabian was investigating Grede for asbestos handling violations.

Fabian walked up the driveway of the residence and observed a middle aged white male and female subject standing near the garage. The male subject identified himself as Kelly Harmsen. Fabian identified himself as an Environmental Warden with the Wisconsin Department of Natural Resources and presented his badge and credentials. Harmsen agreed to discuss the insulation removal project with Fabian. Fabian and Harmsen discussed the project in the garage. The white female subject (presumably Harmsen's wife) was in and around the garage during the discussion.

**Kelly J. Harmsen**
**M/W D.O.B.** Redacted **67**
**241 W. Moore Street**
**Berlin, WI 54923**
**(920) 361-2754**

Harmsen stated that he worked for Grede for about 2 ½ years. He said that he left for a few weeks to take another job during this time but later returned to Grede. Harmsen said that he used to work on third shift but was recently moved to first shift. Harmsen stated that one night (on third shift) in early January 2012 Don Alcorn, the third shift supervisor, told Harmsen and Forrest Woiak to remove the insulation from atop the heat treat oven. Harmsen said that the insulation was damaged from years of water damage from a leaky roof. Harmsen said that the insulation was dry when they removed it. Harmsen said that Harmsen and Woiak removed the insulation but were assisted for awhile by Mike Werch (from Berlin) and Rex Dodd (from Omro), other Grede employees. Harmsen said that Alcorn told them to use respirators because the furnace hadn't been used for many years. Harmsen said that most of the removal occurred during one night (10 hours) with a small amount the following night.

[1]

| Warden Reporting | Date of Report | Exhibit Reference |
| --- | --- | --- |
| Stefan Fabian | April 4, 2012 | |

*This document was produced as a result of an official Law Enforcement investigation. Contents, in whole or part, are privileged by s. 905.09, Wis. Stats., and may not be used without express permission of the Wisconsin Warden service or appropriate prosecutor.*

Harmsen said that the insulation above the heat treat oven consisted of two layers of block insulation, each about 3-4 inches thick. Harmsen said that Alcorn wanted the insulation removed because Grede was going to renovate the oven for use. Harmsen said that the furnace hadn't been used in about 20 or more years. Harmsen said that the insulation was in plain view (it wasn't covered by anything). Alcorn instructed them to use the "Super Sucker". Harmsen said that they removed the insulation using the Super Sucker which chopped the pieces into small fragments before dumping them into a hopper. Harmsen said that the Super Sucker created a lot of dust and blew it over several work areas. Harmsen said that the insulation that the Super Sucker wouldn't suck up was pushed over the side of the oven and allowed to drop onto the floor from about 10 feet high. Harmsen said that they used sticks and ice scrapers to remove the insulation that the Super Sucker wouldn't suck up. Harmsen said that nothing was wetted before, during, or after the removal of insulation.

Harmsen said that they collected two BF (Berlin Foundry) boxes full of the insulation. He said that the boxes were about 3'x3'x3' or 27 cubic feet each. He said that the Super Sucker was also ¾ full of the insulation. Harmsen said that the Super Sucker can hold about 3-4 BF boxes or 108 cubic feet. Harmsen said that the waste insulation filled the two BF boxes, the Super Sucker hopper and additional insulation from atop the furnace remained on the floors and walkways around the oven for a few days before being cleaned up. Harmsen said that all of the insulation that they removed was friable. Harmsen said that Stewart took some photos of the insulation.

Harmsen said that they only removed the insulation from above the back half of the oven. He said that the front half of the oven still has the insulation above it. Harmsen said that Grede hired a contractor to go in and refractor the oven. He said that the contractors put another material over the top of the oven including the insulation above the front half of the oven.

Harmsen said that he looked at the insulation and thought that it could contain asbestos so he started asking other co-workers about the insulation. Harmsen said that nobody from Grede ever mentioned that they had conducted an asbestos inspection before the project began. Harmsen said that he and David Stewart took samples of the insulation from above the oven. Harmsen said that he shared some of it with Dan Bloede (union president), and later Peter Mark, Director of Corporate Safety, Health and Environmental from Oconomowoc. Harmsen said that he didn't send his sample in for analysis. He said that Fabian could take the sample. He said that the sample was double bagged and locked in his garage since he collected it.

Harmsen said that Jessica Fournier from the DNR came to Grede to take samples but took them from inside the oven. Harmsen said that Grede Management also took their samples from inside the oven. Harmsen said that the insulation above the oven was fibrous and different than the material initially sampled. Harmsen said that David Stewart sent a sample to a laboratory and it contained 10% asbestos. Harmsen said that the insulation brick was about 10% of the weight of the fire brick.

Harmsen said that about 10 employees were exposed to the dust created from the removal of the insulation in the Fabrication Building. Harmsen said that other Grede employees may have cleaned up the mess created on the ground. Harmsen said that it remained there for about 3-4 days on the floors, catwalk, etc.

Harmsen said that David Stewart asked the Head of Maintenance after the insulation was removed if anyone ever performed an asbestos inspection before the work began. Harmsen said that he told Stewart that there was no asbestos based upon a sample taken during October 2011. Then about 2-3 weeks ago, Peter Mark and Christy McNamee (Safety Manager) interviewed each employee that was involved with the project. Harmsen said that Mark told him during the interview that he told the local manager that they should check all of the material around the oven for asbestos before the project began.

39

DNR_000256

Harmsen said that Grede conducted a company asbestos safety meeting in February for the whole department. Then Harmsen provided Fabian with three documents:

1) An "Asbestos Awareness Training" document that Harmsen said was given to employees at the asbestos safety meeting.
2) A fax and cover to OSHA regarding the suspected asbestos violations.
3) A January 18, 2012 response from OSHA.

Fabian provided Harmsen with a business card. Fabian thanked Harmsen for his time and left the residence at approximately 6:27 P.M.

DNR_000257

Confidential-Attorney Client Privilege

# REPORT OF INVESTIGATION

| | |
|---|---|
| **Investigation**: U.S. v O'Connell, et. Al. | **Client:** Foley & Lardner LLP |
| **Date:** May 18, 2017 (Thursday) | **Time:** 5:00 p.m. – 6:40 p.m. |
| **Location:** 241 West Moore Street | **City, State:** Berlin, WI 54923 |
| **Participants:** Kelly J. Harmsen<br>Private Detective Spang | **Description:** Interview Report |

On the above date, I interviewed Kelly J. Harmsen (DOB: 01/20/1967) at his residence. The interview took place in his garage. I told Harmsen that I was a Private Detective working for a law firm that represents Grede Foundry ("Grede") in a current criminal case. After discussing the general nature of the investigation Harmsen provided the following information.

1. Harmsen's current telephone number is (920) 369-8512. He is married to Mary Harmsen who was present during substantial parts of the interview. Harmsen completed formal education through the tenth grade. He later obtained a GED. Harmsen currently works as a machinist at Stainless Tech in Ripon, Wisconsin. His current email address is <u>Marharm@yahoo.com</u>.

2. Harmsen started working for Grede/Citation ("Grede") in 2010. Prior to that he mainly worked for several companies in the construction industry. When he started working at Grede Harmsen recalls that Grede provided some training on various safeties related topics. He cannot recall the specific topics. He does not recall any specific training on asbestos related issues. Harmsen did not supervise any employees when he worked at Grede.

3. When he worked at Grede Harmsen was a member of the UAW union. He cannot remember the specific local chapter number. In general, he believes the union had a fairly good working relationship with the company.

4. I told Harmsen that my interview related to his work removing material from the roof of a heat treatment oven in Plant 1 at Grede in 2012. ("oven work") Harmsen's job description at that time was "Production Utility Fill-In" in the "Cleaning Room". The Cleaning Room was used to finish castings by grinding rough edges, etc. As a fill-in Harmsen performed several different tasks for employees that did not show up for work, etc.

## GREDE EMPLOYEES

5. Don Alcorn was Harmsen's immediate supervisor during the oven work. Harmsen

is not sure who was Alcorn's immediate supervisor. It was probably either Angel Silva or Steve O'Connell.

6. Harmsen met Alcorn several years ago at a party. About six weeks prior to the oven work at issue Harmsen began working for Alcorn in Plant 1. About the time of the oven work Alcorn never told Harmsen that he (Alcorn) had been promoted. Alcorn never told Harmsen that he (Alcorn) was promoted during a dinner meeting at the Alibi in Ripon or any other restaurant.

7. Harmsen does not believe that Alcorn is an honest person. He described him as a "bullshitter". Harmsen also recalled an incident around the time of the oven work when Alcorn told a number of the new employees that if they didn't help him (Alcorn) move to a new residence they would be fired. Alcorn did offer to buy them beer if they helped.

8. Alcorn is an intimidating person. He is Samoan and has a number of tattoos. He also speaks in an assertive manner. Alcorn never discussed safety issues with Harmsen, including possible asbestos contamination. Alcorn usually said "just get it done" with respect to any job assignment, including the oven work at issue.

9. Harmsen cannot recall Alcorn making any disparaging statements about O'Connell, Mark or Mcnamee. Alcorn never told Harmsen what he (Harmsen) should tell, or not tell, the agents and investigators involved in this case. Alcorn never told Harmsen that he (Alcorn) had taken samples of the roof debris.

10. Harmsen knows Peter Mark. He saw Mark at the plant about once a month. Mark was in charge of safety issues. Prior to the oven work Harmsen did not have a direct working relationship with Mark.

11. Mark never gave Harmsen any instructions concerning the removal of oven debris. After the removal of the debris Harmsen did discuss the asbestos issue with Mark approximately a few weeks later. At that time Mark told Harmsen that tests had been done on the oven that tested negative for asbestos. Harmsen then told Mark that he had a sample of the debris and he gave that sample to Mark. A few weeks later Mark told Harmsen that "the lab" lost the sample that he (Mark) had sent to the lab. A short time later Harmsen gave Mark a second sample, which Harmsen believes tested positive for asbestos.

12. Harmsen does not believe that Mark is a truthful based on the fact that he (Harmsen) does not believe Mark's statement about "the lab" losing a sample of the debris.

13. Harmsen knew O'Connell for approximately one and one-half years at the time of the oven work. O'Connell was a plant manager. O'Connell never gave Harmsen any instructions concerning the oven work. Harmsen did not routinely work with O'Connell when doing his job.

14. Harmsen does not know O'Connell well enough to form an opinion concerning O'Connell's honesty and integrity.

15. A short time after the oven work management held a meeting with the employees who worked on the oven. Harmsen attended the meeting that focused on the

Case 1:17-cr-00050-WCG Filed 06/12/17 Page 42 of 113 Document 72-1

potential exposure to asbestos while removing the oven debris. Mark, O'Connell and Mcnamee conducted the meeting. A Grede "upper level" manager, Larry Foreman was also at the meeting but did not speak.

16. At the meeting Mark said that they had test results that indicated that the oven did not contain asbestos materials. Harmsen cannot remember what O'Connell or Mcnamee said at the meeting. Mcnamee did hand out an "Asbestos Awareness Training" document *(See Attachment A)* . Harmsen identified the document, but did not want to initial the attachment. The meeting took place near Mcnamee's office and was also attended by the other employees who worked on removing the oven debris.

17. Harmsen has known Mcnamee for several years. They met during a social setting several years ago. Mcnamee never gave Harmsen instructions concerning the removal of the oven debris.

18. As described above Mcnamee was at the meeting that discussed the asbestos issue. (See Paragraphs 15-16). Harmsen does not recall any other conversations with Mcnamee concerning the removal of the oven debris.

19. Harmsen's opinion is that the government has made Mcnamee a "pawn" in this case. He basis his opinion on the fact that he didn't think Mcnamee was qualified for her job relating to safety issues. She also didn't appear to be very "bright" and qualified to do her job. (Harmsen also said that he felt bad calling Mcnamee "not very bright" because he considered her a very nice person and well intentioned).

20. Harmsen's opinion is that Mcnamee is an honest person. He is aware that Mcnamee may have been engaged in a "relationship" with O'Connell.

21. Harmsen did not know Mitchell Kidd very well. He knew that Kidd was a Grede supervisor. Harmsen never discussed the oven work with Kidd. Kidd never gave Harmsen instructions concerning the oven work.

22. Harmsen does not have an opinion concerning Kidd's honesty and integrity. He does believe however, based on conversations with other employees, that Kidd had a reputation for being a "jerk" or "asshole".

23. Harmsen didn't work with Angel Silva. He knew Silva was a supervisor but he cannot remember Silva's title/job position. Harmsen does believe that Silva promoted Alcorn to a management position, but he cannot remember any specific details.

24. Silva never gave Harmsen any instructions concerning the oven work. Silva appeared to be "close" to Kidd. As a result Harmsen does not consider Silva to be trustworthy.

25. Harmsen knew Brooks Arruda to be a Texas contractor that Grede hired to work on the oven. Harmsen did not have any conversations with Arruda concerning the oven work.

26. Harmsen knew Wayde Schwarz to be in charge of maintenance at Grede. Harmsen very seldom worked with Schwarz. Schwarz never gave Harmsen any instructions concerning the oven work. Harmsen does not have an opinion

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 48 of 113   Document 72-1

Confidential-Attorney Client Privilege

concerning Schwarz's honesty and integrity.

27. Harmsen knew David Stewart for several months at the time of the oven work. Stewart worked in maintenance department. Stewart seemed like a "good guy" with respect to a working relationship.

## OVEN WORK

28. Harmsen worked on removing the oven debris at issue in this case. At that time he was working the 3rd shift (11:00 p.m.-7:00 a.m.). His job description was "Production Utility Fill-In". He worked in the "Cleaning Room". Don Alcorn was his immediate supervisor. As a "fill-in" Harmsen worked on different jobs depending on which employees showed up for work.

29. Harmsen worked on the oven for two or three consecutive nights in January 2012. I directed Harmsen to a complaint filed with the Wisconsin DNR by David Stewart on January 12, 2012 relating to the oven work . He said the work was done during that time period.

30. Alcorn was Harmsen's supervisor during the oven work. Alcorn basically told Harmsen and the other workers that they were under a deadline to get the roof ready for a new castable coating. Specifically, Alcorn said that they had to remove the roofing material from the rear half of the oven roof because it had gotten wet over the years. They didn't have to work on the front half of the oven. After the initial instructions Alcorn left them alone to do the work. He may have checked on them periodically during the evening, but Harmsen cannot remember for sure.

31. The other employees who worked on the roof were Raleigh Wilson, Forrest Woiak, Rex Dodd, Werch and Ryan McGrew. Werch and McGrew mainly worked on the inside of the oven.

32. Harmsen and I made a drawing of the oven roof. Harmsen initialed the drawing, which shows a line approximately in the middle indicating that he only worked on the rear half of the oven. Harmsen could not remember, however, the exhaust pipes on the roof. (**See Attachment A**)

33. I also showed Harmsen a binder containing photographs of the oven at different time periods. Harmsen identified the oven in the photographs as the one he worked on as described above. (**See Attachment B**)

34. Harmsen described the material that they removed from the oven roof as a "mushy brick" like material. It was clear that water had soaked into the material over the years. It was dry at the time of removal, however.

35. Harmsen and the other employees used various tools to remove the oven debris from the rear half of the oven. One of the tools resembled a garden hoe. Another garden rake. They also used shovels and scrappers. Harmsen does not remember anyone using an air hammer on the roof. It may have been used inside the oven.

36. Harmsen worked from a ladder on the side of the oven. He was too big to crawl

on top of the oven roof because of the low ceiling above the roof. Woiak and Dodd were small enough the crawl on top of the roof . Harmsen is pretty sure that Wilson also worked from a ladder because of his size.

37. After the material was cut loose using the different tools the debris/bricks was pushed over the side on to the catwalk and floor. Some of this was done by hand. Most of it was done with the "hoe" like tool. Harmsen "vaguely" remembered the small "lip" on the edge of the roof. He said that using the hoe they were able to get the debris/bricks over the side and onto the floor.

38. At the time of the oven work Harmsen was not able to identify asbestos on sight. He does recall that he saw what appeared to be "crystals" in the debris/brick they removed from the oven roof. He wasn't sure if the crystals were asbestos, or not.

39. Harmsen helped put the debris/brick that was on the floor into large boxes. In general, he and the other employees used shovels to remove the debris from the floor and put it in the boxes. Harmsen could not remember the specific size or number of the boxes. Harmsen does not know the final disposition of the roof debris.

40. Harmsen was never trained in how to use the "super sucker". When he arrived for work on the second day of oven work the super sucker was by the oven. He could see that the maintenance department had prepared a special electric source for the super sucker. Harmsen assumes that Alcorn ordered the super sucker to be used because they were "under the gun" to get the roof debris removed.

41. Harmsen and the other employees all used the super sucker by passing the large hose from worker to worker while it was in suction mode. That way they could work on different areas of the roof.

42. When they were using the super sucker a large amount of dust began exiting the exhaust pipe of the super sucker. Harmsen said the same thing can happen with a home "power vac" if you don't use a filter. They were wearing cloth masks at that time and didn't shut off the super sucker.

43. Harmsen's said that they continued using the super sucker because of Alcorn. Alcorn did not give them any specific instructions to keep using the super sucker, but he had told them that the roof had to be cleared of debris. Because of his intimidating manner, no one wanted to tell him that they hadn't finished the project.

44. Harmsen does not recall anyone opening the large bay door opposite the front door of the oven when the dust was in the air. In January it would have been cold and there was no heat in Plant 1 where the oven was located. He doesn't think anyone would have opened the door.

45. Neither Mark, O'Connell, nor Mcnamee gave Harmsen any instructions relating to the oven work during the time period when the work was being done.

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 45 of 113   Document 72-1

Confidential-Attorney Client Privilege

## HARMSEN OVEN ROOF SAMPLES

46. On the second day, when he was working on the oven roof, Harmsen talked to David Stewart who worked in the maintenance department for Plant 1. Stewart was aware of the "dust cloud" created by the super sucker being used on the oven roof. Stewart and Harmsen agreed that someone should take a sample of the roof debris in case in contained asbestos.

47. After the conversation with Stewart, Harmsen took a sample of the material he was working on from the top of the roof. He also took a second sample from the debris that was on the floor on the right side of the oven. He put both samples in one gallon sized zip-lock bag. The samples were commingled. He then put that bag in a second one gallon sized zip lock bag to make sure the sample didn't become airborne if it was asbestos. Harmsen doesn't know if Stewart, or any other Grede employees took samples.

48. When his shift ended Harmsen took his sample home and put it on a shelf in his garage. (This is where our interview took place). It is a large two-car garage. The shelf was part of a three or four shelf self-standing unit commonly available at Home Depot or Menards. The shelf was in the corner near one of the two garage doors. The sample was not put in a safe or otherwise protected container.

49. Approximately one week later Harmsen told his "drinking buddy" Daniel Bloede who also worked at Grede that he (Harmsen) had a sample of the material removed from the oven roof. Bloede was a UAW union representative. Harmsen took a portion of his commingled sample from the gallon zip lock bag he took originally from the oven roof and floor. He put that sample into a second one gallon sized zip locked bag. He then double bagged that sample in another one gallon sized zip locked bag. He gave that bag to Bloede. A few weeks later he saw Bloede give the bag to DNR Warden Fabian. (Based on other discovery reports it does not appear that Fabian was told that the sample was commingled with samples from the top of the roof and the floor. Fabian also didn't ask Bloede or Harmsen any chain of custody questions. )

50. A few weeks later Harmsen had a discussion with Mark. The conversation took place in Plant 1 near the "blaster machine". At that time Mark told Harmsen that they did not have any positive tests for asbestos relating to the oven. Harmsen told Mark that he had a sample of the material removed from the oven. A short time later Harmsen gave Mark a sample of the material he kept in the garage. Again, he removed a portion of the sample he gave to Mark from the original/garage bag retaining a sample for him.

51. Harmsen cannot remember the time period, but a few weeks later Harmsen again had a conversation with Mark in Plant 1. At that time Mark told Harmsen that "The Lab" had lost the sample he (Harmsen) had given him that Mark had submitted for testing. A short time later Harmsen gave Mark a second sample from his "garage" material.

52. Harmsen showed me a Professional Laboratory report dated February 13, 2012 that indicated a positive test for asbestos. Harmsen said that this report related to a

Case 1:17-cr-00050-WCG Filed 06/12/17 Page 46 of 113 Document 72-1

sample he had given to Bloede, and that the union had submitted for testing.

53. Over a year later EPA Special Agent Oros asked Harmsen for a sample of the material he (Harmsen) removed from the oven. Harmsen then gave Oros a sample of the garage material. Harmsen did not tell Oros that the material included roof and floor materials. Oros did not ask any chain of custody questions. Harmsen indicated that he did not have any more samples.

54. Numerous individuals were in Harmsen's garage during the time period between January 2012 and the time Harmsen gave Oros his sample of the oven roof material. These individuals were "friends" who worked with Harmsen on various work projects or just socialized. Drinking alcohol was also involved at times.

55. At other times Harmsen would leave the garage doors open, especially in summer, and at times he was not there directly to secure the area.

56. I asked Harmsen what was his motive for taking the samples. Harmsen said that it was basically "CYA" ("Cover Your Ass"). At that time he had been "screwed over" by several prior employees, and in general, he did not trust Grede to treat him fairly.

## OTHER INFORMATION

57. Harmsen has been to the Alibi Bar and Grill in Ripon. This occurred several years ago. He did not go there with any Grede employees. He was never there with Alcorn.

58. Harmsen was interviewed several times by either DNR or EPA agents. The agents did not make any promises to Harmsen with respect to his statements. The agents never told Harmsen to not talk to defense investigators or attorneys. The agents did ask Harmsen at his last interview if any defense investigators had interviewed him. Harmsen never saw the agents conducting their investigation at Grede because he worked the third shift.

59. Approximately one year ago Harmsen testified before a grand jury in Milwaukee concerning this case. Harmsen recalls a male Assistant United States Attorney ("AUSA") asking him questions in the grand jury. He cannot remember his name. He also met an unidentified female AUSA.

60. No AUSA asked Harmsen to not talk to defense investigators or attorneys. No AUSA made any promises to Harmsen with respect to his testimony.

61. Harmsen has consulted an attorney with respect to this case. He did not want to identify the attorney. Also, he said he did not retain the attorney.

62. At various times during the interview Mary Harmsen showed Kelly what appeared to be a series of documents when I asked specific questions. Harmsen did not want to show me all the documents, but he did say they included notes that Mary prepared based on their conversations concerning this case. Harmsen also showed me a laboratory report relating to the sample of debris he had given to the UAW

representative.

63. Harmsen did see a doctor after the oven work. Grede paid for and arranged the doctor's appointment. After pulmonary examinations the doctor told Harmsen that he shouldn't worry about asbestos related health issues. Harmsen has not had a pulmonary issue since the oven work. (Harmsen did smoke several cigarettes during our interview).

64. I went over a brief summary of our interview based on my notes. Harmsen agreed with my summary. He did not want to add any additional information at this time. I told Harmsen that commonly I usually follow up with additional questions when I prepare an interview report. Harmsen said that he would be available for follow up questions.

_____

Michael Spang
Private Detective

AMERICAN AIR ENVIRONMENTAL
SVCS, INC.

49 West 11th Avenue
Oshkosh, WI 54902-6009

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 4/30/2012 | 2120428 |

PAID
06/04/2012

**BILL TO**

Peter Mark
Citation - Grede II, LLC
320 Madison Ave
Omro, WI 54963

| P.O. NO. | TERMS | DUE DATE |
|----------|-------|----------|
| | Net 20 | 5/20/2012 |

| QUANTITY | DESCRIPTION | RATE | AMOUNT |
|----------|-------------|------|--------|
| 2 | Bulk Sample Analysis | 25.00 | 50.00 |

Please remit to above address.

| **Total** | $50.00 |

A SERVICE CHARGE OF 1 1/2% PER MONTH (18% PER ANNUM) MAY BE
CHARGED ON ALL ACCOUNTS OVER 30 DAYS OLD FROM DATE OF INVOICE.

| Phone # | Fax # | E-mail |
|---------|-------|--------|
| (920) 233-7577 | (920) 233-7671 | gayle@aaes.com |

AMERICAN AIR_000008

**AMERICAN AIR ENVIRONMENTAL SERVICES, INC.**



# PLM ANALYTICAL REPORT

| | |
|---|---|
| Date Collected: | 4/25/2012 |
| Date Received: | 4/25/2012 |
| Submitted By: | Walk-in |
| Analysis Requested: | PLM-Bulk |

Sampler: Peter Mark
Affiliation: Same
Project Site: 320 Madison Omro, WI
File Number: D12-493

| Sample # | Location | Type/Color | Asbestos % | % Fibrous | % Non-Fibrous Composition |
|---|---|---|---|---|---|
| A | Heat Treat | Fire Brick/Wht/Brwn | 20% Chrysotile | 25% Cellulose | 55% |
| B | Heat Treat | Fire Brick/Wht/Brwn | 20% Chrysotile | 25% Cellulose | 55% |

Comments:

Analyst:

*Jerry Hinke*

Analytical Method: PLM with Dispersion Staining

ND - Indicates No Asbestos Detected

This report may not be reproduced without express authorization of American Air Environmental Services, Inc. Samples will be disposed of in two weeks unless otherwise stated.

Approved by:

*Thomas S. Franks*

49 West 11th Avenue
Oshkosh, WI 54902

Established in 1988

Ph: (920) 233-7577
Fax: (920) 233-7671
Email: aaes@vbe.com

American Air Environmental Services, Inc  (b) 233-7577
49 West 11th Avenue  Oshkosh, Wi., 902
Bulk Sample Extraction Log / Chain of Custody

Client Name Address _____ Date _____

Sampler _____

| Sample# | Area | Material Description | Extraction Point |
|---------|------|---------------------|------------------|
| A | | fire brack | Roof tront |
| B | | fire brack | rat tront |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Please Call 1-44-303-1355

with the Results

Thank You

Peter Wash

Received By Gayle Ruish

Date Time 4/25/12

Signature _____

Relinquished B _____

Date Time _____

Signature _____

THE INDIVIDUAL SIGNING ABOVE HEREBY AGREES TO PAY ANY ALL INFULL FOR
LABORATORY ANALYSIS AND FINAL REPORT AS STIPULATED ON VALS INC INVOICE
DELINQUENT ACCOUNTS WILL BE ASSESSED AT 1.5% PER MONTH SERVICE CHARGE

AMERICAN AIR_000010

## LABORATORY LOG-IN

| Date | Time | Sample # | Lab ID # | Submit by | Rec by | Sample Location | Client | Batch # | Lab Name |
|------|------|----------|----------|-----------|--------|-----------------|--------|---------|----------|
| | | 2-1 | D12 478 | Wall... | JH | N/A | ... T LiMi | D12 ₆₄₉ | |
| | | 641 | 79 | | | | | | |
| | | | D12 45d | ... | ... | N.1905 ... | ... ... | D12 ₆₈ | |
| | | 2 | 481 | | | | | | |
| 1/28 | | 6... | D2 482 | wall... | ... | ... ... | ... ... | D2 ₆₈₇ | |
| | | 6.61 | 483 | | | | | | |
| 4/... | | 1 | D12 484 | ... | 14 | meeting her... | some | D12 ₆₈... | |
| | | 2 | 55 | | | | | | |
| | | 3 | 86 | | | | | | |
| | | 12 | 87 | | | | | | |
| | | 4 | 88 | | | | | | |
| | | 42 | 89 | | | | | | |
| | | 5 | 90 | | | | | | |
| | | 52 | 91 | | | | | | |
| 4/22 | | 1 | D12 492 | ... | 62 | ... ... | ... ... | D12 ₆₅₃ | |
| 4/22 | | 2 | D12 493 | ... | 92 | 320 ... | ... ... | D12 ₆₄ | |
| | | 3 | 494 | | | | | | |
| 7/27 | | 5:M 739 | D12 495 | ...ik... | 62 | ... # ... | ... ... | D12 ₆₅₆ | |
| | | 5:M 740 | D12 496 | | | | | | |
| 4/27 | | | D12 497 | otytk... | 68 | read Ime... | ... ... | D12 ₆₅₆ | |
| 4/30 | | 1 | D2 498 | ... | 62 | ... ... | ... ... | D12 ₆₅₇ | |
| | | 52 | D2 499 | | | | | D12 ₆₅₆ | |
| | | A.C.L | 27 | | | N/A | ... Tighe | | |
| | | | E 651 | ... | | ... ... | ... | ... ... | |
| | | 1 | E12 502 | ... | TE | 64 Kle/tr... | ... | E12 ₆₆₁ | |
| | | 1... | 503 | | | | | | |
| | | ... | 504 | | | | | | |

AMERICAN AIR_000011

Grede Wisconsin Subsidiaries, LLC
242 South Pearl Street
Berlin, WI 54923
(920)361-2220

 **GREDE**
*Sealing Integrity*

Payment Date:  6/01/12
Vendor No.      300027

AMERICAN AIR ENVIRONMENTAL
49 WEST 11TH AVE
OSHKOSH WI 54901-6009

| Invoice Number | Invoice Date | | Gross Amount | Discount | Net Amount |
|---|---|---|---|---|---|
| 2120428 | 4/30/12 | | 50.00 | .00 | 50.00 |
| | | Check Total | | | $50.00 |

AMERICAN AIR_000012

Summary of Deposits to West Pointe Checking on 06/04/2012

| Chk No. | PmtMethod | Red From | Memo | Amount |
|---------|-----------|----------|------|--------|
| 124689 | Check | Citation - Grede II, LLC | | 175.00 |
| 27714 | Check | Cardinal Environmental | | 140.00 |
| 1401 | Check | Weinert Roofing | | 30.00 |
| 124823 | Check | Citation - Grede II, LLC | | 50.00 |
| 1057 | Check | Pfefferle Investments Inc. | | 6,250.00 |

**Less Cash Back:**

**Deposit Total:**                                                           6,645.00

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 54 of 113   Document 72-1

AMERICAN AIR_000013

| Case Number | Case Title |
|---|---|
| 12-C111-005 | Grede Wisconsin Subsidiaries, LLC |

| Activity | Date of Activity |
|---|---|
| Daniel Bloede interview | June 7, 2012 |

Narrative[1]

Environmental Warden Stefan Fabian stopped at the Dan Bloede residence on June 7, 2012 at approximately 7:45 PM. The Bloede residence is located at 211 Chilewski Drive, Coloma, Wisconsin. The purpose of the stop was to discuss Bloede's knowledge regarding the removal of insulation from a heat treat oven at the Grede Wisconsin Subsidiaries, LLC (Grede) foundry in Berlin. Fabian was investigating Grede for the improper handling of asbestos at the Grede foundry in Berlin, Wisconsin.

Fabian walked up the driveway of the residence and observed a white male subject standing in the garage. The subject identified himself as Dan Bloede. Fabian introduced himself as an Environmental Warden with the Wisconsin Department of Natural Resources and presented his badge and credentials. Bloede agreed to speak with Fabian about the heat treat oven and invited Fabian into the garage.

**Daniel D. Bloede**
**M/W 9/11/77**
**211 Chilewski Drive**
**Coloma, Wisconsin 54930**
**(920) 789-8332**

Bloede stated that he works at the Grede Foundry and is the Union President. Bloede said that Kelly Harmsen, a Grede worker, gave Peter Mark, the Director of Corporate Safety, Health & Environmental, a sample of the insulation that was removed from the heat treat oven during January 2012. Bloede said that Mark was questioned about the sample results from the insulation but told Harmsen that he lost the sample.

Bloede said that Mark Fulcer, the General Improvements Manager at Grede, is good friends with Mitch Kidd, the former General Manager at Grede, and Steve O'Connell, the former Operations Manager at Grede. Bloede stated that both Kidd and O'Connell were fired from Grede sometime during February – March 2012. Bloede said that Christy McNamee is the Grede Safety Manager and is supposedly in an intimate relationship with Steve O'Connell. Bloede said that McNamee was recently suspended without pay for a few days for keeping in contact with O'Connell. Bloede

| Warden Reporting | Date of Report | Exhibit Reference |
|---|---|---|
| Stefan Fabian | June 11, 2012 | |

*This document was produced as a result of an official Law Enforcement investigation. Contents, in whole or part, are privileged by s. 905.09, Wis. Stats., and may not be used without express permission of the Wisconsin Warden service or appropriate prosecutor.*

said that O'Connell currently works for a foundry in Waukesha that is Grede's competitor (Navistar)

Bloede stated that Kidd and O'Connell both had computers in their offices when at Grede. Bloede said that Wayde Schwartz, the Maintenance Supervisor, and McNamee still have computers in their offices. Bloede drew a diagram of the layout of the site including: the Heat Treat/Fabrication area, Plant 2, Plant 3 and the office building. Bloede documented where each had their office located. Bloede further stated that Kidd, O'Connell, Schwartz, and McNamee all had/have email addresses. Bloede said that the format used for the email addresses is, the first person's first initial followed by their last name and then "@Grede.com". For example Mitch Kidd's email address was MKidd@Grede.com. Bloede said that he received emails from Kidd, O'Connell, and McNamee. He stated that as the Union President he would correspond to various employees at Grede. Bloede said that he has these emails on his home computer and the union hall computer at 217 Broadway Street in Berlin. Bloede said that the email address that he uses to correspond to Grede employees is D.Bloede@yahoo.com.

Bloede said that Harmsen gave Bloede a sample of the insulation that was removed from the heat treat oven. Bloede said that he had the sample at the union hall in Berlin. Bloede said that he also has various documents involving the heat treat oven insulation removal incident. Bloede said that Fabian could review each if he met with him on Friday at 4:15 PM.

Fabian agreed to meet with Bloede at the union hall on June 8, 2012 at 4:15 PM. Fabian thanked Bloede for his time and gave him a business card. Fabian left the residence at approximately 8:52 PM.

DNR_000322

91

P+D          P+t 3

Hill

WADDE
← SCWARTZ

watch          office
office →    +4    STEVE
              OFFICE

parking

CHRISTY'S
OFFICE

Heat Treat        Isacu's
Fab

coreroom

HEAT
TREAT
OVEN

OU HAVE COMPUTORS + EMAIL ADDRESSES

M KIDD @ GROOE .com
S O'CONNEL @ GROOE . com

DNR_000323

State of Wisconsin
Department of Natural Resources
Law Enforcement

| Case Number | Case Title | |
|---|---|---|
| 12-C111-005 | Grede Wisconsin Subsidiaries, LLC | |
| Activity | | Date of Activity |
| Sample Collection from Dan Bloede | | June 8, 2012 |

Narrative[1]

Environmental Warden Stefan Fabian stopped at the USW Union Hall on June 8, 2012 at approximately 4:15 PM. The USW Union Hall is located at 217 Broadway Street, Berlin, Wisconsin. The purpose of the stop was to collect a sample and review documents possessed by Dan Bloede. Bloede is the union president for the USW workers at the Grede Wisconsin Subsidiaries , LLC Foundry (Grede). Fabian was investigating Grede for improper asbestos handling. Bloede told Fabian during an interview on June 7, 2012 that he had documents, a sample, and a computer that had information on it regarding Grede and the insulation removal incident involving the heat treat oven.

**Dan Bloede, USW President**
**217 Broadway Street**
**Berlin, WI 54923**
**(920) 789-8332**

Fabian walked into the front entrance of the building and observed a white male subject who Fabian recognized as Dan Bloede standing at a table in the rear of the building. Bloede invited Fabian to the table where Bloede was looking at electronic documents on his laptop computer. Bloede showed Fabian some emails located on the computer that he received from Grede employees.

Several minutes later Bloede and Fabian were joined by a white male subject who Fabian recognized as Kelly Harmsen. Bloede gave Fabian a sample of insulation that was doubled wrapped in plastic zip lock bags. Bloede told Fabian that this was the sample that was given to him by Harmsen. Bloede said that this sample was from the insulation removed from atop of the heat treat oven during January 2012. Bloede told Fabian that he could have the sample. Harmsen said that the sample was taken from the material that he removed from atop the heat treat oven. Harmsen said that only the deteriorating insulation was removed. Harmsen said that Fabian could drill through the new refractory and obtain his own sample of the insulation if necessary. Harmsen said that some of the insulation is still intact above the heat treat oven.

Then Bloede gave Fabian documents to review including:

1

| Warden Reporting | Date of Report | Exhibit Reference |
|---|---|---|
| Stefan Fabian | June 11, 2012 | |

This document was produced as a result of an official Law Enforcement investigation. Contents, in whole or part, are privileged by s. 905.09, Wis. Stats., and may not be used without express permission of the Wisconsin Warden service or appropriate prosecutor.

- A January 27, 2012 email from Peter Mark to Christy McNamee (with a 4 page laboratory report)
- A January 12, 2012 letter from Brook Arruda
- A PLM Analytical Report dated October 21, 2011
- A certificate of bulk asbestos analysis from Pro-Lab
- An Asbestos Awareness Training document
- A Notice of Alleged Safety or Health Hazards complaint #84970

Fabian made copies of each.

Bloede said that Mitch Kidd resigned from Grede on February 15, 2012 according to a February 16, 2012 email that Bloede received. Bloede said that Angel Silva is a good friend of Kidd's that used to work with Kidd out east and then was hired by Kidd at Grede.

Fabian thanked Bloede for his time. Fabian left the union hall at approximately 5:12 PM

DNR_000325

# Analytical Laboratory Report

June 25, 2012

Report ID: 9513721

STEFAN FABIAN
WI DNR AIR BULK ASBESTOS SAMPLE
2984 SHAWANO AVE
GREEN BAY WI 54313

Company Number: 32494

**GREDE WISCONSIN SUBSIDARIES**

Date Received:     6/13/2012
Date Reported:    6/25/2012

Analyst: _____

JOHN KNIGHT, Senior Chemist
jk@mail.slh.wisc.edu

Reviewer: _____

STEVE STREBEL, WOHL Director
ss@mail.slh.wisc.edu

WOHL uses only verified, secured electronic signatures on reports.
These signatures are as valid as original handwritten signatures.

If you have any questions regarding this report please feel free to contact the
laboratory via email (as listed above) or via telephone at 800-446-0403

Report ID: 9513721                    Page 1 of 4

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 60 of 113   Document 72-1    DNR_000490

# Analytical Results

| LAB NUMBER | | |
|---|---|---|
| FIELD NUMBER | DESCRIPTION | AIR VOLUME |
| .536423 | GRAY GRANULAR | |

Bulk Asbestos             ASBESTOS DETECTED

Chrysotile Asbestos       PRESENT

COMMENTS:    15% CHRYSOTILE ASBESTOS, 5% glass fiber, & mineral grain matrix. (Analysis
            Date: 6/22/12)

Displayed values on report have been rounded; however all calculations are performed using raw, unrounded intermediate results.
Please contact the laboratory if you have any questions regarding our result calculation or rounding. All samples were received by the
laboratory in acceptable condition unless otherwise noted.

JOHN KNIGHT, Senior Chemist

06/25/2012
Date

# Analytical Methodology

**BULK ASBESTOS BY PLM, METHOD WA001blk:**
The analytic method used for analysis was WOHL Method WA001blk.12 BULK
ASBESTOS BY PLM. If Point counting was done then WOHL method WA002blk.10 was
used. This method is based upon EPA-600/M4-82-020, "Interim Method for the
determination of Asbestos in Bulk Insulation Samples", 40 CFR, Part 763,
Subpart E, Appendix E, and associated EPA clarifications. Based upon this
method, sample results are reported for each layer analyzed. Samples which
contain >1% asbestos are regulated as asbestos containing materials.

Samples are initially examined with a low power stereomicroscope. An initial
estimation of the type/percent asbestos (if present) is made. A small portion
of each sample (or of each layer) is mounted on a glass slide in a few drops
of Cargill high dispersion RI oil. The mounted sample is then analyzed using
a Polarized Light Microscope at magnifications ranging between 20X-400X.
Positive identification of any asbestiform minerals present is done using a
10X Dispersion Staining objective, and measuring other specific identifying
optical properties. If an asbestiform mineral is detected in a sample, its'
quantity is determined either by calibrated visual estimation or by Point
Counting. There are six regulated asbestos minerals which may be present.
These varieties are: Chrysotile, Amosite, Tremolite, Actinolite, Crocidolite
and Anthophyllite.

If the final value = ND then no asbestiform minerals were detected in the
sample.

Special note regarding floor tiles:
Because some floor tiles have been shown to contain significant amounts of
asbestos which may be undetectable by standard PLM analysis, we recommend
additional analysis using a Transmission Electron Microscope method. This
method requires special sample preparation techniques beyond what is usually
found with the standard PLM method.

Instrumentation:

The instruments used may include the following: Nikon SMZ-1B low power
stereomicroscope; Nikon Optiphot polarizing light microscope equipped with a
10x dispersion staining objective, 2x, 10x and 20x pol objectives.

Quantitation Limit: 1% asbestos by visual estimation and 0.25% by 400 point
count.

Quality control performed as required by AIHA (American Industrial Hygiene
Association). Samples are retained for a period of 3 years before disposed of
by laboratory unless prior arrangements have been made.

JOHN KNIGHT, Senior Chemist                    06/25/2012
                                                  Date

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 62 of 113   Document 72-1         DNR_000492

## End of Analytical Report

The results in this report apply only to the samples, specifically listed above, tested at the Wisconsin Occupational Health Laboratory .
This report is not to be reproduced except in full.

JOHN KNIGHT; Senior Chemist

06/25/2012
Date

| Case Number | Case Title |
|---|---|
| | Grede Foudry/Berlin, WI |

| Activity | Date of Activity |
|---|---|
| Site visit due to complaint | 1-12-12 |

Narrative

On January 12, 2012 Jessica Fournier responded to a complaint from Department of Health Services about a brick type insulation removal from a 90+ year old furnace. The complaint stated two employees used shovels and an industrial vacuum to clean up debris. Fournier arrived to 242 South Pearl Street, Berlin, WI at 10.10 am and asked to speak with a Facility Manager

Wade Schwarz met with Fournier in the main lobby at the facility. Fournier explained the complaint to Schwarz and asked if an asbestos inspection had been done. Schwarz said there was an inspection and went to get a copy for Fournier. The inspection was conducted by American Air Environmental Services, Inc. on October 21, 2011. Three samples of three materials were analyzed and found to not contain asbestos. Fournier asked to see the furnace where the work was done

Schwarz invited Peter Mark (Director of Corporate Safety, Health & Environmental for Grede) along with Fournier to see the furnace. Upon arrival to the furnace, two workers were removing brick from the inside of the furnace. Fournier took a sample of each material, brick, mortar, and surfacing material for bulk sample analysis. Fournier also took a picture of the furnace



| Inspector | Date of Report | |
|---|---|---|
| Jessica Fournier | 1-24-12 | |

DNR_000247

Fournier told Schwarz and Mark that Fournier would send out an email when the samples come back in.

On January 20, 2012 the sample results came back as no asbestos detected.

DNR_000248

| Case Number | Case Title Grede Foundry – Berlin | |
|---|---|---|
| Activity Complaint | | Date of Activity 2-14-12 |

Narrative[1]

On February 14, 2012 Fournier received a second complaint from David Stewart (920-376-1943). Fournier spoke with Stewart who explained the material Fournier had tested in a prior visit is not the material that was in question. Stewart explained brick like material on the top of the furnace that was removed by two Grede, non-certified employees is a different material than the material that was tested on the inside of the furnace. Stewart said all the material from the top of the furnace was gone now, but there are pieces of the brick along the side of the furnace. Stewart described the brick as light weight material that was light grey on the outside and darker grey on the inside. Stewart also emailed Fournier photos of the material in boxes after it was removed, a map of the area and where the debris was by the furnace, and sample results from a piece of the material Stewart had tested. The sample results show the material tested to have 10% asbestos.

1

| Inspector Jessica Fournier | Date of Report 2-17-12 | |
|---|---|---|

| Case Number | Case Title | |
|---|---|---|
| | Grede Foundry – Berlin | |
| Activity | | Date of Activity |
| Site visit #2 | | 12-17-12 |

Narrative[1]

On February 17, 2012 at 9:30 am Jessica Fournier met with Dan McClung (DHS), Sharon Reyes (OSHA), Peter Mark (Grede – Director of Corp. Safety, Health & Enviro), Christy McNamee (Grede - Safety Coordinator), and Wade Schwartz (Grede – Head of Maintenance) at Grede Foundry, 242 S Pearl St, Berlin, WI. The group met in a conference room and discussed the reason for the visit. Fournier explained there have been more complaints that the material tested was not the material removed from the top of the furnace. Fournier explained there may be some debris around the furnace. Schwartz explained the material on top of the furnace was removed from inside the furnace and brought down through the furnace so material should not be found around the furnace. All the material that was removed was deposited into a dumpster and has been taken to a landfill. Fournier explained DNR, DHS, and OSHA would need to see the furnace again so Reyes could take air samples, Fournier could take bulk samples, and McClung could take tape samples of dust.

The Grede group led Fournier, McClung and Reyes to the furnace in Plant 1. Inspection around the furnace showed many different kinds of debris around the furnace. McClung took pictures and Fournier took four samples. On the right side of the Fournier took two samples. Sample GFB01 was of white refractory material. GFB02 was of white fibrous material found in black dirt next to the furnace. Sample GFB03 was taken from the left side of the furnace of a light grey fiber brick material. Sample GFB04 was taken from the let side of the furnace of a light orange brick material. On the left side of the furnace in an opening next to the walk way there was several bricks of the material sampled. Fournier asked McNamee if this material came from the top of the furnace. McNamee said the brick was removed from the top of the furnace through the inside of the furnace so the material on the side must be from something else.

Fournier and McClung asked to see the vacuum that was used to remove the brick and dust. McNamee took Fournier and McClung to a different plant where the vacuum is now located. McNamee stated the hopper the vacuum goes into has been emptied several times since the furnace project. After seeing the vacuum McClung stated the vacuum was so dirty there was no reason to take a tape sample because the lab would not be able to pick out and asbestos fibers if there were any.

1

| Inspector | Date of Report | |
|---|---|---|
| Jessica Fournier | 2-17-12 | |

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 67 of 113   Document 72-1

DNR_000250

| Case Number | Case Title |  |
|---|---|---|
|  | Grede Foundry/Berlin, WI |  |
| Activity | | Date of Activity |
| Call to Peter Mark regarding sample results | | 2-27-12 |

Narrative[1]

On February 27, 2012 Jessica Fournier called Peter Mark (Grede Director of Corporate Safety, Health & Environmental 414-303-9355) at 9:30 am. Fournier told Mark that one of the samples from the February 17, 2012 visit was positive for asbestos. Fournier told Mark to limit access to the area around the furnace and contact a certified abatement company to clean it up as soon as possible. Mark still claims the bricks along the side of the furnace are from a different time and are not consistent with the bricks that were removed from the top of the furnace.

1

| Inspector | Date of Report |  |
|---|---|---|
| Jessica Fournier | 6-13-12 |  |

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 68 of 113   Document 72-1

DNR_000251

State of Wisconsin
Department of Natural Resources

| Case Number | Case Title Grede Foundry/Berlin, WI | |
|---|---|---|
| Activity Phone call from Kelly Harmsen | | Date of Activity 3-6-12 |

Narrative[1]

At 9 am on March 6, 2012 Jessica Fournier received a call from Kelly Harmsen (920-361-2754) who works 3rd shift for Grede Foundry, Berlin, WI. Harmsen told Fournier that Harmsen was one of the people who removed the brick from the top of the furnace at Grede Foundry in Berlin. Harmsen stated during the removal Harmsen had dropped many pieces of debris off the side of the furnace. Harmsen told Fournier the sample Fournier took from the side of the furnace between the walls was definitely the same material that was removed from the top of the furnace. Fournier's sample was found to contain 10% asbestos. Harmsen and some of the union representatives still have samples of the material that was removed from the top of the furnace. Harmsen worked on the furnace for ten hours the night of the removal. Harmsen stated a large vacuum without a filter was used along with shovels to remove the material from the top of the furnace.

1

| Inspector Jessica Fournier | Date of Report | |
|---|---|---|

# Analytical Laboratory Report

February 22, 2012

Report ID:    9495670

JESSICA FOURNIER
WI DNR AIR BULK ASBESTOS SAMPLE
625 E CR-Y
SUITE 700
OSHKOSH WI  54901

Company Number:    32494

**GREDE FOUNDRY – BERLIN**

PO# NMB00000078

| | |
|---|---|
| Date Collected: | 2/17/2012 |
| Date Received: | 2/17/2012 |
| Date Reported: | 2/22/2012 |

Analyst: _____

JOHN KNIGHT, Senior Chemist
jk@mail.slh.wisc.edu

Reviewer: _____

LEROY DOBSON, Chemist Supervisor
ld@mail.slh.wisc.edu

WOHL uses only verified, secured electronic signatures on reports.
These signatures are as valid as original handwritten signatures.
If you have any questions regarding this report please feel free to contact the
laboratory via email (as listed above) or via telephone at 800-446-0403

# Analytical Results

| **FIELD NUMBER** | **DESCRIPTION** | **AIR VOLUME** |
|---|---|---|
| **519998** | WHITE GRANULAR | |

**FB01**
**Bulk Asbestos**           NO ASBESTOS DETECTED

**COMMENTS:**   Consists of a mineral grain matrix. (Analysis Date: 2/22/12)

| **519999** | DK GRAY GRANULAR | |
|---|---|---|

**7B02**
**Bulk Asbestos**           NO ASBESTOS DETECTED

**COMMENTS:**   Consists of 2% glass fiber, & mineral grain matrix.

| **520000** | DK GRAY GRANULAR | |
|---|---|---|

**7B03**
**Bulk Asbestos**           NO ASBESTOS DETECTED

**COMMENTS:**   Consists of 95% glass mineral wool fiber, & 5% non-asbestos mineral fiber.

| **520001** | DK GRAY GRANULAR | |
|---|---|---|

**7B04**
**Bulk Asbestos**           ASBESTOS DETECTED
**Chrysotile Asbestos**           PRESENT

**COMMENTS:**   10% CHRYSOTILE ASBESTOS, in a mineral grain matrix.

isplayed values on report have been rounded; however all calculations are performed using raw, unrounded intermediate results. lease contact the laboratory if you have any questions regarding our result calculation or rounding. All samples were received by the boratory in acceptable condition unless otherwise noted.

JOHN KNIGHT, Senior Chemist     02/22/2012   Date

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 71 of 113   Document 72-1     DNR_000487

# Analytical Methodology

**BULK ASBESTOS BY PLM, METHOD WA001blk:**

The analytic method used for analysis was WOHL Method WA001blk.12 BULK ASBESTOS BY PLM. If Point counting was done then WOHL method WA002blk.10 was used. This method is based upon EPA-600/M4-82-020, "Interim Method for the determination of Asbestos in Bulk Insulation Samples", 40 CFR, Part 763, Subpart E, Appendix E, and associated EPA clarifications. Based upon this method, sample results are reported for each layer analyzed. Samples which contain >1% asbestos are regulated as asbestos containing materials.

Samples are initially examined with a low power stereomicroscope. An initial estimation of the type/percent asbestos (if present) is made. A small portion of each sample (or of each layer) is mounted on a glass slide in a few drops of Cargill high dispersion RI oil. The mounted sample is then analyzed using a Polarized Light Microscope at magnifications ranging between 20X-400X. Positive identification of any asbestiform minerals present is done using a 10X Dispersion Staining objective, and measuring other specific identifying optical properties. If an asbestiform mineral is detected in a sample, its' quantity is determined either by calibrated visual estimation or by Point Counting. There are six regulated asbestos minerals which may be present. These varieties are: Chrysotile, Amosite, Tremolite, Actinolite, Crocidolite and Anthophyllite.

If the final value = ND then no asbestiform minerals were detected in the sample.

Special note regarding floor tiles:
Because some floor tiles have been shown to contain significant amounts of asbestos which may be undetectable by standard PLM analysis, we recommend additional analysis using a Transmission Electron Microscope method. This method requires special sample preparation techniques beyond what is usually found with the standard PLM method.

Instrumentation:

The instruments used may include the following: Nikon SM2-1B low power stereomicroscope; Nikon Optiphot polarizing light microscope equipped with a 10x dispersion staining objective, 2x, 10x and 20x pol objectives.

Quantitation Limit: 1% asbestos by visual estimation and 0.25% by 400 point count.

Quality control performed as required by AIHA (American Industrial Hygiene Association). Samples are retained for a period of 3 years before disposed of by laboratory unless prior arrangements have been made.

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 72 of 113   Document 72-1          DNR_000488

## End of Analytical Report

The results in this report apply only to the samples, specifically listed above, tested at the Wisconsin Occupational Health Laboratory . This report is not to be reproduced except in full.

JOHN KNIGHT, Senior Chemist          02/22/2012
                                              Date

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 73 of 113   Document 72-1          DNR_000489

State of Wisconsin
Department of Natural Resources
Law Enforcement

| Case Number | Case Title | |
|---|---|---|
| 12-C111-005 | Grede Wisconsin Subsidiaries, LLC | |
| Activity | | Date of Activity |
| Sharon Reyes Ingalls interview | | February 10, 2016 |

Narrative'

Will Oros, a Special Investigator for the United Stated Environmental Protection Agency's Criminal Investigation Division, and I, Environmental Warden Stefan Fabian, stopped at the Sharon Ingalls residence on Wednesday, February 10, 2016 at approximately 12:58 p.m. The Ingalls residence is located at 19220 Sunny Slope Road, Reedsville, Wisconsin. The purpose of the stop was to discuss Ingalls' knowledge of an asbestos removal project from the Grede Foundry (Grede) located at 242 South Pearl Street, Berlin, Wisconsin during January 2012. Ingalls was an Occupational Health and Safety Administration (OSHA) inspector on this date. Oros and I were investigating Grede for asbestos removal violations.

**Sharon Reyes Ingalls**
**D.O.B. ~~Redacted~~ 1950**
**19220 Sunny Slope Road**
**Reedsville, WI 54230**

Oros knocked on the door and was greeted by a white female subject who Oros later stated that he recognized as Sharon Reyes Ingalls from a previous visit. Ingalls introduced herself to me. I identified myself as an Environmental Warden from the Wisconsin Department of Natural Resources and stated that I worked on criminal environmental investigations and was assisting Oros. Ingalls invited us into her house.

Ingalls stated that she worked as an Industrial Hygienist for OSHA and as such responded to a complaint regarding illegal asbestos removal from the Grede Foundry (the site). The complaint involved the alleged dry removal of asbestos from a heat treat oven. Ingalls said that the oven hadn't been used in last 10-15 years and was about 40 years old. Ingalls said that she stopped to perform an unannounced inspection at the site on January 19, 2012. Ingalls said that Grede had a large number of employees at the open meeting portion of the inspection. She said that the company managers weren't shocked that she stopped. She said that Grede was "loaded for bear". Ingalls said that some of the staff that were at the opening meeting included: Christy McNamee, a pseudo Health and Safety Manager that wasn't very helpful; Wade Schwartz, a plant engineer that didn't appear to be forthcoming; Peter Mark, a Manager of multiple Grede facilities; Mitch Kidd; Stephen O'Connell, and others including union representatives.

1

| Warden Reporting | Date of Report | Exhibit Reference |
|---|---|---|
| Stefan Fabian | February 16, 2016 | |

*This document was produced as a result of an official Law Enforcement investigation. Contents, in whole or part, are privileged by s. 905.09, Wis. Stats., and may not be used without express permission of the Wisconsin Warden service or appropriate prosecutor.*

Ingalls said that only McNamee, Mark, and one local manager walked the site with her after the open meeting. She said that Schwartz and Mark told her during the open meeting that Grede was familiar with asbestos. She said that although Schwartz was familiar with asbestos rules he didn't accompany her on the walk around. McNamee was Ingalls primary point of contact during Ingalls' investigation.

She said that three employees removed material from the roof and walls of the heat treat oven which was located in the maintenance and warehouse area of the site. She said that Schwarz told her that Grede employees were jack hammering on the top and sides of the oven. She said that Ryan McGrew, one of the employees that did the actual work, told her that Grede removed material from both the top and sides of the oven. McNamee and Mark were present when McGrew told her this. McGrew further used a "super sucker" to remove the debris from the oven. Ingalls said that Grede employees were exposed to airborne material during the removal of material from the walls and roof of the oven. Ingalls said that Raleigh Wilson was another employee that did work on the oven. Ingalls said that it seemed strange to her that they removed the material at 3:00 A.M.

Ingalls said that Schwartz and Mark were both aware at the open meeting that material was removed from both the roof and sides of the oven. Schwartz and Mark told Ingalls that Grede had done asbestos removal projects at the Berlin site in the past. They were both present and involved in the discussions. Schwarz did most of the talking during the meeting. Schwartz told her that Grede was removing old material from the roof and pouring two inches of new refractory on it. Ingalls provided them with a copy of the complaint during the open meeting. She said that Schwartz told her that he did some tests on the material but it didn't contain any asbestos. She said unbeknownst to her at the time, the material that he tested only came from the walls and not the roof. Ingalls said that McNamee and Schwartz told her that there was no asbestos involved with the refurbishing of the oven.

Ingalls said that McNamee provided her with some documents. Ingalls said that McNamee provided her with an email dated Tuesday, January 17, 2012 from Wayde Schwartz to Christy McNamee along with an attachment. The attachment was a PLM Analytical Report from American Air Environmental Services, Inc. The report contained three sample results all indicating no asbestos present. The report indicated that the samples were collected on October 21, 2011. Ingalls added that McNamee further provided her with a letter from Professional Coating Technologies signed and dated by Brooks Arruda on January 12, 2012. This letter stated that there was no asbestos present on the roof of the heat treat oven. Oros provided both of these documents while Ingalls identified them as the ones provided to her by McNamee on January 17, 2012. Ingalls said these were the documents that she referenced in her narrative report as documents provided by Grede.

Ingalls reviewed a document provided to her by Oros entitled U.S. Department of Labor Citation and Notification of Penalty. Ingalls stated that Grede was cited for having employees use filtering face piece respirators against asbestos fibers. Ingalls said that one of the employees told her that he used a ½ face mask. She said that she would have closed out the OSHA investigation based upon the documents provided to her including emails, sample results and the January 12, 2012 letter from Professional Coating Technologies (signed by Brooks Arruda), an alleged impartial third party company certifying that there was no asbestos on the roof of the oven. However Ingalls received an additional complaint after her initial inspection. Ingalls said that without seeing the actual removal being conducted she had to rely on the information provided by Grede and any workers she was able to interview. Ingalls said she asked McNamee and Mark to interview employees who performed the removal. She said she was told McGrew was the only employee available to interview during her inspection. She spoke with McGrew off to the side without McNamee and Mark but that they could see Ingalls speaking with McGrew. Ingalls said that the Grede wasn't very forthcoming with information. Ingalls added that McNamee and Mark

accompanied her on the inspection of the heat treat oven. She said that during the inspection of the heat treat area it was clear from her observations and conversation with McNamee and Mark that work had been done on top of the heat treat oven and material was removed from the top of the heat treat oven.

Ingalls said that she went back to reinvestigate on February 17, 2012 after the complainant called back and stated that Ingalls was not shown the area of concern. She said during her first investigation she did not look behind the oven because the points of entry and exit had limited access. Ingalls stated that samples taken during this return inspection, from areas she previously didn't access, tested positive for asbestos. Ingalls said that the samples were taken from material that she thinks originated from the roof of the oven. Ingalls said that Grede never shared any positive asbestos samples with her that were collected by Grede employees. She further stated that Grede never provided her with a narrative detailing the event. Ingalls stated that Sky Fatland, another Industrial Hygienist with OSHA inspected Grede sites in the past.

We thanked Ingalls for her time. Fabian provided her with his business card. We left the residence at approximately 2:33 P.M.

REPORTS AND ATT_000143

## 2/17/2012  ASBESTOS RESULTS
### for Heat Treat Oven Area

| Location | Sample Type | Contaminant | Sample Time | Monitoring Results (TWA-8hr) | OSHA PEL |
| --- | --- | --- | --- | --- | --- |
| Area 1<br>Rt. Front area of oven | Area sample | Chrysotile | 68 min. | ND | 1.0 f/cc TWA |
| Area 2<br>Storage rack across aisle from oven | Area sample | Chrysotile | 65 min. | ND | 1.0 f/cc TWA |
| Core 1<br>Suctioned from rack toward maintenance Room | Bulk | Chrysotile | N/A | ND | N/A |
| A1<br>Right side of oven | Bulk | Chrysotile | N/A | 1.2% | N/A |
| A2<br>Left side of oven | Bulk | Chrysotile | N/A | 1.9% | N/A |
| A3<br>Left rear of oven, On frame | Bulk | Chrysotile | N/A | 1.9% | N/A |
| B1<br>Soft debris by blocks in back, left side of oven | Bulk | Chrysotile | N/A | 0.6% | N/A |
| B2<br>Soft debris by blocks in back, left side of oven | Bulk | Chrysotile | N/A | 1.3% | N/A |

*These results are considered exposure records and shall be made available to employees in accordance to 1910.20 and 1910.1020.*

➤ ND: None determined.
➤ TWA: Time Weighted Average; Employee's 8-hour average airborne exposure.

# AMERICAN AIR ENVIRONMENTAL SVCS, INC.
## Customer QuickReport
January 1, 2012 through September 9, 2016

| Type | Date | Num | Amount |
|------|------|-----|--------|
| **Citation - Grede II, LLC** | | | |
| Invoice | 02/24/2012 | 2120220 | 175.00 |
| Invoice | 04/30/2012 | 2120428 | 50.00 |
| Payment | 06/01/2012 | 124689 | 175.00 |
| Payment | 06/04/2012 | 124823 | 50.00 |

AMERICAN AIR_000002

**AMERICAN AIR ENVIRONMENTAL.
SVCS, INC.**

49 West 11th Avenue
Oshkosh, WI 54902-6009

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 2/24/2012 | 2120220 |

PAID
06/01/2012

**BILL TO**

Citation - Grede II, LLC
242 South Pearl Street
Berlin, WI 54923

| P.O. NO. | TERMS | DUE DATE |
|----------|-------|----------|
|  | Net 20 | 3/15/2012 |

| QUANTITY | DESCRIPTION | RATE | AMOUNT |
|----------|-------------|------|--------|
| | per Wayde Schwarz | | |
| | Heat Treat | | |
| 7 | Bulk Sample Analysis | 25.00 | 175.00 |

Thank you for your business!

| | | | **Total** | | $175.00 |

A SERVICE CHARGE OF 1 1/2% PER MONTH (18% PER ANNUM) MAY BE
CHARGED ON ALL ACCOUNTS OVER 30 DAYS OLD FROM DATE OF INVOICE.

| Phone # | Fax # | E-mail |
|---------|-------|--------|
| (920) 233-7577 | (920) 233-7671 | gaylc@aacs.com |

AMERICAN AIR_000003



## PLM ANALYTICAL REPORT

Sampler: W Schwarz
Affiliation: Grede II, LLC
Project Site: 242 S Pearl St Berlin WI -Heat Treat
File Number: B12-102

Date Collected: 2/20/2012
Date Received: 2/21/2012
Submitted By: GR
Analysis Requested: PLM-Bulk

| Sample # | Location | Type/Color | Asbestos % | % Fibrous | % Non-Fibrous Composition |
|---|---|---|---|---|---|
| A | Back HT Center | Floor Dirt/Brown | Present Chrysotile | Cellulose | 97% |
| B | Back HT South | Back HT South | Present Chrysotile | Cellulose | 97% |
| C | West HT | Floor Dirt/Brown | ND | Cellulose | 100% |
| D | N # 1 E | Brick/Brown | ND | 10% Cellulose, 30% Mineral Wool | |
| E | S # 2 E | Brick/Brown | 10% Chrysotile | 5% Cellulose | |
| F | S # 3 E | Brick/Brown | 15% Chrysotile | 5% Cellulose | |
| G | Rack | Dirt Brown | ND | | 100% |

Analyst: Jerry Himke

Analytical Method: PLM with Dispersion Staining

ND - Indicates No Asbestos Detected

This report may not be reproduced without express authorization of American Air Environmental
Services, Inc. Samples will be disposed of in two weeks unless otherwise noted.

Approved by: Thomas S Franks

49 West 11th Avenue
Oshkosh, WI 54902

Established in 1988

Ph (920) 233-7577
Fax. (920) 233-7671
E-mail: aaes@vbe.com

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 80 of 113   Document 72-1
AMERICAN AIR_000004

# SHIPPING MEMO

Greder
Citation
242 S Pearl Street
Berlin, Wisconsin
(920) 361-2220

13313

TO  American Air Environmental      DATE 2-20      2012

| YOUR NO | | OUR NO |
|---|---|---|
| | DEPT NO/REQ | B/L NO |

| SHIPPED VIA | | UPS | Parcel Post | TRUCK LINE | Their Truck | Our Truck | Charges $ | Collect Prepaid |
|---|---|---|---|---|---|---|---|---|

| ITEM | QTY | DESCRIPTION | | NO. PKGS | WEIGHT |
|---|---|---|---|---|---|
| 1 | 7 | Samples - Analyze Each for Presence of Asbestos | | | |
| | A) | Back of Heat treat - Center - Floor Dirt | | | |
| | B) | Back of Heat treat - South - Floor Dirt | | | |
| | C) | West Side of Heat Treat - Floor Dirt | | | |
| | D) | North #1 East Side of Heat treat - Brick | | | |
| | E) | South #2 East Side of Heat treat - Brick | | | |
| | F) | South #3 East End of Heat treat - Brick | | | |
| | G) | Dirt on Rock | | | |

Received By

BF29
REV 5-8-20

AMERICAN AIR_000005

## LABORATORY LOG-IN

| Date | Time | Sample # | Lab ID # | Submit by | Rec by | Sample Location | Client | Batch # | Lab Name |
|------|------|----------|----------|-----------|--------|-----------------|--------|---------|----------|
| 2/21 | | 1 | 162 | | | 242 | | | |
| | | 3 | 3 | | | | | | |
| | | C | 4 | | | | | | |
| | | D | 5 | | | | | | |
| | | E | 6 | | | | | | |
| | | | 7 | | | | | | |
| | | | 8 | | | | | | |
| 2/21 | | | 42 | | | | | | |
| | | | 10 | | | | | | |
| | | 2 | 11 | | | | | | |
| | | | 12 | | | | | | |
| 2 | | 1 | 112 | | | Tommy Place | | | |
| | | 2 | | | | Bahco Room | | | |
| | | 3 | 115 | | | | | | |
| | | 4 | 116 | | | | | | |
| | | 5 | 117 | | | Maintenance | | | |
| | | 6 | 118 | | | | | | |
| | | 7 | 119 | | | | | | |
| | | 8 | 110 | | | | | | |
| | | 9 | 121 | | | | | | |
| | | 10 | 112 | | | | | | |
| | | 11 | 123 | | | | | | |
| | | 12 | 124 | | | | | | |
| | | 13 | 125 | | | | | | |
| | | 14 | 126 | | | | | | |
| | | 15 | 127 | | | | | | |

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 82 of 113   Document 72-1
AMERICAN AIR_000006

Grede Wisconsin Subsidiaries, LLC
242 South Pearl Street
Berlin, WI 54923
(920)361-2220

 **GREDE**

124689

Payment Date:  5/25/12
Vendor No..      300027

AMERICAN AIR ENVIRONMENTAL
49 WEST 11TH AVE
OSHKOSH WI 54901-6009

| Invoice Number | Invoice Date | | Gross Amount | Discount | Net Amount |
|---|---|---|---|---|---|
| 2120220 | 2/24/12 | | 175.00 | 00 | 175.00 |
| | | Check Total | | | $175.00 |

AMERICAN AIR_000007

CAROLINA
ENVIRONMENTAL, INC.

CHAIN OF CUSTODY RECORD
ASBESTOS/LEAD ANALYSIS

**Client:** Eagle Environmental Testing, LLC

**Project Manager:** Brad Welko

**Address:** Wild Turf Green Willow Ct.

**Phone:** (980) 915-2821

Greenville WI 54942

**Fax:** (980) 757-9636

**EMail:** brad@eagle.testing.com

**PO #:**

| PROJECT DESCRIPTION | PROJECT CODE | | PLM Bulk | PLM Point Count | PLM Gravimetric | PCM Air | TEM Bulk | TEM Air | Lead Paint | Lead Wipe | Lead Soil | Lead Air | Other Analysis | CLIENT ID# |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | |

**ASBESTOS** | **LEAD PAINT**

Greak Foundry | 13073046 | 2/ | 2/ | | | | | | | | | | | | 25716.0

**TURN-AROUND TIME**

5 DAYS
3 DAYS
X 48 HOURS
24 HOURS
4 HOURS

Samples will be disposed of 30 days after analysis, unless otherwise requested.

**REMARKS:**

**Relinquished By:** Bradley Welker  **Date / Time:** 3/3/12  **Received By:** Rebecca Forrester  **Date/Time:** 2019 9:40 am

**Relinquished By:**  **Date / Time:**  **Received By:**  **Date / Time:**

CEI FORM #200-1 VERSION 2004

DNR_000506



**LEGEND:**  Non-Anth = Non-Asbestiform Anthophyllite
Non-Trem = Non-Asbestiform Tremolite
Calc Carb = Calcium Carbonate

**METHOD:**  **EPA 600 / R93 / 116 and EPA 600 / M4-82 / 020**

The detection limit for the method is <1% by visual estimation and 0.25% by 400 point counts or 0.1% by 1,000 point counts.

Due to the limitations of the EPA 600 Method, nonfriable organically bound materials (NOBs) such as vinyl floor tiles can be difficult to analyze via polarizing light microscopy (PLM). EPA recommends that all NOBs analyzed by PLM, and found not to contain asbestos, be further analyzed by Transmission Electron Microscopy (TEM). Please note that PLM analysis of dust and soil samples for asbestos is not covered under NVLAP accreditation.

This report may not be reproduced, except in full, without written approval by CEI LABS. CEI LABS makes no warranty representation regarding the accuracy of client submitted information in preparing and presenting analytical results. This report may not be used by the client to claim product endorsement by NVLAP or any other agency of the U. S. Government.

ANALYST: _____         APPROVED BY: _____

Madison M. Roberts                                   Tianbao Bai, Ph.D.
                                                                 Laboratory Director

**NVLAP**
NVLAP Lab Code 101768-0



# ASBESTOS BULK ANALYSIS
### By: POLARIZING LIGHT MICROSCOPY

| | |
|---|---|
| **Client:** Eagle Environmental Testing<br>W6674 Green Willow Court<br>Greenville, WI 54942 | **CEI Lab Code:** A12-2196<br>**Date Received:** 03-14-12<br>**Date Reported:** 03-14-12 |

**Project:** Grede Foundry; 1203046

## ASBESTOS BULK PLM, EPA 600 METHOD

| Client ID<br>Lab ID | Lab<br>Description | Lab<br>Attributes | NON-ASBESTOS COMPONENTS | | | | ASBESTOS<br>% |
|---|---|---|---|---|---|---|---|
| | | | Fibrous | | Non-Fibrous | | |
| 9<br>A1264098 | Grout | Heterogeneous<br>Grey<br>Non-fibrous<br>Bound | | | 50%<br>50% | Binder<br>Silicate Mineral | None Detected |
| 10<br>A1264099 | Ceramic Tile | Heterogeneous<br>White<br>Non-fibrous<br>Bound | | | 30%<br>70% | Binder<br>Silicate Mineral | None Detected |
| 11<br>A1264100 | Grout | Heterogeneous<br>Grey<br>Non-fibrous<br>Bound | | | 50%<br>50% | Binder<br>Silicate Mineral | None Detected |
| 12<br>A1264101 | Adhesive | Heterogeneous<br>Tan<br>Non-fibrous<br>Bound | | | 100% | Mastic | None Detected |
| 13<br>A1264102 | Drywall | Heterogeneous<br>White<br>Fibrous<br>Bound | 15% | Celluiose | 65%<br>20% | Gypsum<br>Binder | None Detected |
| 14<br>A1264103 | Joint Compound | Heterogeneous<br>White<br>Fibrous<br>Bound | | | 50%<br>50% | Binder<br>Calc Carb | None Detected |
| 15<br>A1264104 | Floor Tile | Heterogeneous<br>Tan<br>Non-fibrous<br>Tightly Bound | | | 100% | Vinyl | None Detected |
| 16<br>A1264105 | Mastic | Heterogeneous<br>Black<br>Non-fibrous<br>Bound | | | 95% | Mastic | 5% Chrysotile |

Page 2 of 4



# Asbestos Report Summary
## By: POLARIZING LIGHT MICROSCOPY

**PROJECT:** Grede Foundry; 1203046      **CEI LAB CODE:** A12-2196

**METHOD: EPA 600 / R93 / 116 and EPA 600 / M4-82 / 020**

| Client ID | Layer | Lab ID | Color | Sample Description | ASBESTOS % |
|---|---|---|---|---|---|
| 1 | | A1264090 | White | Caulking | None Detected |
| 2 | | A1264091 | White | Caulking | None Detected |
| 3 | | A1264092 | Brown | Baseboard | None Detected |
| 4 | | A1264093 | Tan | Mastic | None Detected |
| 5 | | A1264094 | Grey | Caulking | None Detected |
| 6 | | A1264095 | Grey | Grout | None Detected |
| 7 | | A1264096 | Grey | Caulking | None Detected |
| 8 | | A1264097 | White | Ceramic Tile | None Detected |
| 9 | | A1264098 | Grey | Grout | None Detected |
| 10 | | A1264099 | White | Ceramic Tile | None Detected |
| 11 | | A1264100 | Grey | Grout | None Detected |
| 12 | | A1264101 | Tan | Adhesive | None Detected |
| 13 | | A1264102 | White | Drywall | None Detected |
| 14 | | A1264103 | White | Joint Compound | None Detected |
| 15 | | A1264104 | Tan | Floor Tile | None Detected |
| 16 | | A1264105 | Black | Mastic | Chrysotile 5% |
| 17 | | A1264106 | Off-white | Ceiling Tile | None Detected |
| 18 | | A1264107 | Off-white | Ceiling Tile | None Detected |
| 19 | | A1264108 | Black | Caulking | None Detected |
| 20 | | A1264109 | Black | Caulking | None Detected |
| 21 | | A1264110 | Black | Vibration Isolator Joint | None Detected |

# EAGLE ENVIRONMENTAL TESTING, LLC
## ASBESTOS BULK SAMPLE LOG

PROJECT NAME: __Grede Foundry__

LAB PROJECT NO.: __1203046__

INSPECTOR: __Brad Welko AII-11147__

LOCATION: __242 South Pearl Street, Berlin, WI__

COLLECTION DATE: __March 13, 2012__

PAGE ____1____ OF ____1____

| SAMPLE NO. | SAMPLE LOCATION | MATERIAL DESCRIPTION | ASBESTOS CONTENT |
|---|---|---|---|
| 1 | First floor middle room ceiling | Span-crete ceiling joint caulk | None detected |
| 2 | First floor south room ceiling | Span-crete ceiling joint caulk | None detected |
| 3 | First floor south room east wall | 4" Baseboard | None detected |
| 4 | First floor south room east wall | Baseboard mastic | None detected |
| 5 | First floor middle room west door frame | Door perimeter caulk | None detected |
| 6 | First floor middle room floor | Old ceramic quick-set grout residue | None detected |
| 7 | First floor exterior east wall door frame | Door perimeter caulk | None detected |
| 8 | First floor north room floor | 1" Ceramic floor tile | None detected |
| 9 | First floor north room floor | Ceramic floor tile grout | None detected |
| 10 | First floor north room wall | 6" Ceramic baseboard | None detected |
| 11 | First floor north room wall | Baseboard grout | None detected |
| 12 | First floor north room wall | Baseboard adhesive | None detected |
| 13 | Second floor north room wall | Drywall | None detected |
| 14 | Second floor north room wall | Joint compound | None detected |
| 15 | Second floor south room floor | 12" Tan floor tile | None detected |
| 16 | Second floor south room floor | Black floor tile mastic | 5% Chrysotile |
| 17 | Second floor south room ceiling | 2'x 4' White pinhole crater ceiling tiles | None detected |
| 18 | Second floor middle room ceiling | 2'x 4' White pinhole fissure ceiling tiles | None detected |
| 19 | Second floor middle room east window | Window perimeter caulk | None detected |
| 20 | Exterior second floor north room east wall window | Window perimeter caulk | None detected |
| 21 | Roof on ductwork | Vibration isolator joint | None detected |

FORM ASB-002 (4/99)

## 3.0 ASBESTOS SURVEY SUMMARY

### 3.1 Sampled Materials

Please see the asbestos bulk sample log table following this report for a list of all sampled materials. The laboratory results can also be found following this report.

According the National Emission Standards for Hazardous Air Pollutants (NESHAP); Asbestos NESHAP revision Final Rule in the Federal Register, Volume 55, Number 224, dated November 20, 1990, which applies to building renovations and demolitions, any friable material containing less than 10 percent asbestos by the PLM method is recommended to be verified by the Point Count Method. Samples with a "trace" or less than 1% result were further verified by Point Count Method for the purposed of this report. Samples with a result ranging from 2% to 10% were not point counted and were accepted as reported. Materials containing less than 1% asbestos are not regulated by EPA or DHS, however, OSHA regulates asbestos at any amount.

### 3.2 Assumed materials

The following materials were not sampled but were assumed to contain asbestos based upon inspector past experience or based upon the ability of the material to impact the project.

- Assumed electrical panels

## 4.0 RECOMMENDATIONS

The EPA's NESHAP rule dictates for demolition purposes that all friable asbestos containing material (ACM) (i.e., ceiling tile, thermal insulation) and non-friable ACM (Category II materials) that may become friable during demolition (i.e., transite/slate panels), be removed from the building prior to demolition if the demolition activities are expected to impact such materials. Friable ACM is defined as "any material that contains asbestos in the amount >1%, that can be crumbled to a powder by hand pressure." The following friable or Category II asbestos containing materials were observed during this inspection. Materials located on concrete or block are listed in this section to facilitate recycling.

| MATERIAL | LOCATION | QUANTITY |
|---|---|---|
| Black floor tile mastic on concrete | Second floor all three rooms | 520 square feet |

Category I non-friable materials (roofing materials, asphalt-like materials, gaskets, mastics and resilient flooring) that contain asbestos and are in good condition can be left in place during normal demolition processes. However, should additional methods of further reducing the demolition debris (i.e. grinding, cutting, burning, crushing) occur, Category I materials must also be removed prior to demolition. An example of when Category I floor tile/mastic must be removed prior to demolition is recycling of the concrete which pulverizes and reduces it to powder. The following Category I or II non-friable ACM that may be left in place during normal demolition with no recycling is as follows:

| MATERIAL | LOCATION | QUANTITY |
|---|---|---|
| None | | |

Assumed electrical panel boxes and equipment were not accessed during the survey. Asbestos components may be present in the boxes. They should be removed and separated from any recycling stream and the interior components must remain un-damaged during demolition. They may be disposed of with the general demolition debris. As destructive techniques may not have been utilized during the inspection, wall interiors and other inaccessible areas that may contain ACBM's may not have been accessed. These areas should be verified for the presence of suspect ACBM during the demolition process and should not be disturbed if suspect ACBM is encountered.



**ENVIRONMENTAL TESTING**

W6874 Green Willow Ct · Greenville, WI 54942
(920) 915-2821 · fax (920)757-9536
brad@eagletesting.com

March 15, 2012

Ms. Christy McNamee
Grede Foundry
242 South Pearl Street
Berlin, WI 54923

SUBJECT:  Asbestos Demolition Inspection
West offices of Plant 3
EAGLE No. 1203046

## 1.0  INTRODUCTION

This report presents the findings of an inspection for the presence of asbestos performed by EAGLE ENVIRONMENTAL TESTING, LLC (EAGLE) of the west offices built out within the Plant 3 building at the Grede Foundry in Berlin, WI.  The area surveyed included a two story block structure along the west wall of the building. There is approximately 520 square feet on each floor. No other structures were included in this inspection.  The structure was estimated to be constructed in the 1975.  The structure lies in Green Lake County in the DNR's Northeast region.  The inspection and bulk sampling were conducted during a site visit on March 13, 2012, by Wisconsin and EPA certified asbestos building inspector Brad Weiko (Wisconsin Inspector #AII-111147).  EAGLE is certified under Wisconsin Administrative Code HFS 159 as a Primary Asbestos Company (#CAP-965170).

The purpose of the inspection was to determine if asbestos containing building materials were present in the structure prior to demolition.  Twenty-one (21) bulk samples were collected at the structure and analyzed at Carolina Environmental's NVLAP accredited laboratory in Cary, NC.  Inaccessible areas such as mechanical equipment interiors, chimney interiors, wall interiors, enclosed ceiling spaces, or isolated building spaces were not inspected or sampled from. The survey did not include the sampling of concrete products, or inaccessible adhesives. Electrical panels and control boxes were not sampled and should be removed prior to demolition.

## 2.0  METHODOLOGY

Analysis for the presence of asbestos fibers in bulk samples is performed using polarized light microscopy (PLM) and dispersion staining techniques.  The analysis was performed in accordance with current U.S. Environmental Protection Agency (USEPA) protocols, "The Interim Method for the Determination of Asbestos in Bulk Insulation Samples," EPA 600/M4-82/020.

Samples reported as "None Detected" contained no detectable asbestos fibers in the sample portions analyzed.  All reported percentages are by volume estimates.  In the case of non-homogeneous samples (samples which contain more than one material which are not mixed) reported percentages are based on the total sample as received.  The test results reported relate only to the samples submitted for analysis.

ADVANCED ASBESTOS_000033

3.0    **ASBESTOS SURVEY SUMMARY**

3.1 Sampled Materials

Please see the asbestos bulk sample log table following this report for a list of all sampled materials. The laboratory results can also be found following this report.

According to the National Emission Standards for Hazardous Air Pollutants (NESHAP); Asbestos NESHAP revision Final Rule in the Federal Register, Volume 55, Number 224, dated November 20, 1990, which applies to building renovations and demolitions, any friable material containing less than 10 percent asbestos by the PLM method is recommended to be verified by the Point Count Method. Samples with a "trace" or less than 1% result were further verified by Point Count Method for the purposed of this report. Samples with a result ranging from 2% to 10% were not point counted and were accepted as reported. Materials containing less than 1% asbestos are not regulated by EPA or DHS, however, OSHA regulates asbestos at any amount.

3.2 Assumed materials

The following materials were not sampled but were assumed to contain asbestos based upon inspector past experience or based upon the ability of the material to impact the project.

- Assumed electrical panels

4.0    **RECOMMENDATIONS**

The EPA's NESHAP rule dictates for demolition purposes that all friable asbestos containing material (ACM) (i.e., ceiling tile, thermal insulation) and non-friable ACM (Category II materials) that may become friable during demolition (i.e., transite/slate panels), be removed from the building prior to demolition if the demolition activities are expected to impact such materials. Friable ACM is defined as "any material that contains asbestos in the amount >1%, that can be crumbled to a powder by hand pressure." The following friable or Category II asbestos containing materials were observed during this inspection. Materials located on concrete or block are listed in this section to facilitate recycling.

| MATERIAL | LOCATION | QUANTITY |
|---|---|---|
| Black floor tile mastic on concrete | Second floor all three rooms | 520 square feet |

Category I non-friable materials (roofing materials, asphalt-like materials, gaskets, mastics and resilient flooring) that contain asbestos and are in good condition can be left in place during normal demolition processes. However, should additional methods of further reducing the demolition debris (i.e. grinding, cutting, burning, crushing) occur, Category I materials must also be removed prior to demolition. An example of when Category I floor tile/mastic must be removed prior to demolition is recycling of the concrete which pulverizes and reduces it to powder. The following Category I or II non-friable ACM that **may be left in place** during normal demolition with **no recycling** is as follows:

| MATERIAL | LOCATION | QUANTITY |
|---|---|---|
| None | | |

Assumed electrical panel boxes and equipment were not accessed during the survey. Asbestos components may be present in the boxes. They should be removed and separated from any recycling stream and the interior components must remain un-damaged during demolition. They may be disposed of with the general demolition debris. As destructive techniques may not have been utilized during the inspection, wall interiors and other inaccessible areas that may contain ACBM's may not have been accessed. These areas should be verified for the presence of suspect ACBM during the demolition process and should not be disturbed if suspect ACBM is encountered.

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 91 of 113   Document 72-1
ADVANCED ASBESTOS_000034

5.0    **DISCUSSION**

There are presently six types of mineral fibers that are regulated as asbestos minerals. These are divided into two groups: amphibole asbestos and serpentine asbestos. Serpentine asbestos is called chrysotile which is the most commonly found asbestos in the United States. The other five asbestos minerals belong to the amphibole group. In this group there is fibrous grunerite (amosite), fibrous riebeckite (crocidolite), fibrous anthophyllite, fibrous tremolite, and fibrous actinolite.

6.0    **QUALITY ASSURANCE**

Carolina Environmental's laboratory is accredited by the National Institute for Standards and Technology (NIST) through the National Voluntary Laboratory Accreditation Program (NVLAP), Accreditation Number is 101768-0. The laboratory proficiency record, certification and quality assurance manual are available on request.

7.0    **REMARKS**

In conclusion, the services performed by EAGLE on this project have been conducted with that level of care and skill ordinarily exercised by reputable members of the profession, practicing in the same locality, under similar budget and time constraints. No warrant is expressed or intended.

The laboratory results given in the report must not be used by the client to claim product endorsement by NVLAP or any agency of the U.S. Government. The samples will by retained by our laboratory for 30 days from the date of this report and then discarded unless other instructions are received by the client.

Please see the attached sampling and certification data. If you have any questions regarding this project or need additional sampling conducted, please do not hesitate to contact me.

Submitted by,

EAGLE ENVIRONMENTAL TESTING, LLC

Brad Welko
Project Manager

ADVANCED ASBESTOS_000035



ENVIRONMENTAL PROTECTION AGENCY
Office of Enforcement and Compliance Monitoring

NATIONAL ENFORCEMENT INVESTIGATIONS CENTER
Building 53, Box 25227, Denver Federal Center
Denver, Colorado 80225

CHAIN OF CUSTODY RECORD

ENFORCEMENT CONFIDENTIAL          FOIA EXEMPT          DO NOT RELEASE

N 13507

PROJ. NO. RPUst    PROJECT NAME  Grede

SAMPLERS: (Signature)

See previous chain of custody in the sample

| STA. NO. | DATE | TIME | COMP. | GRAB | STATION LOCATIONS | NO. CONTAINERS | TAG NUMBERS | SAMPLE TAG VERIFICATION | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| 1526607 | 5/4/5 | | | | | 1 | | | |
| 1526615 | 5/4/5 | | | | | 1 | | | |
| 1536623 | 5/4/5 | | | | | 1 | | | |

Relinquished by: (Signature)    Date / Time 5/4/5 11:00am    Received by: (Signature)    Relinquished by: (Signature)    Date / Time    Received by: (Signature)

Relinquished by: (Signature)    Date / Time    Received by: (Signature)    Relinquished by: (Signature)    Date / Time    Received by: (Signature)

Relinquished by: (Signature)    Date / Time    Received for Laboratory by: (Signature)    Date / Time 5.14.05  13:45    Remarks  TN 1Z A4Z 01T 8449758600 7    Received by: (Signature)

Distribution: Original Accompanies Shipment; Copy to Coordinator Field Files

* U. S. GOVERNMENT PRINTING OFFICE : 1986—773—227

NEICRP1656r01

Appendix A
Page 1 of 3

Grede Foundry
Minneapolis, Minnesota

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 93 of 113   Document 72-1

# WISCONSIN OCCUPATIONAL HEALTH LABORATORY (WOHL) SAMPLE SUBMISSION FORM

Send Results To ATTN: _STEVEN_ _FLOWEN_

WOHL COMP #

_WDN R_
_2984 SHANNON AVE_
_GREEN BAY, WI 54313_

Bill To _____

Phone # _(920) 662 - 5143_

FAX # _(920) 662 - 5413_

Email Address _steven.flowen @ wisconsin.gov_

NEIC # 166680101

Project _GREEN WISCONSIN SUBSIDIARY, LLC_

P.O. # _32494_

Turnaround: ☐ RUSH ☐ PRIORITY ☒ NORMAL

Date Sampled _3/23/12_

□ PLEASE GROUP SAMPLES BY MEDIA USED AND ANALYSIS REQUESTED. *

SPECIAL INSTRUCTIONS

| LAB USE ONLY WOHL SAMPLE # | CUSTOMER FIELD # | SAMPLE MEDIA | WIPE SAMPLES SIZE OF AREA WIPED EX: 2 IN x 2 IN | FOR AIR SAMPLES TIME ON | TIME OFF | TOTAL TIME (MINS) | SAMPLES ONLY FLOW RATE (L/MIN) | VOLUME (LITERS) | ANALYSIS REQUEST |
|---|---|---|---|---|---|---|---|---|---|
| 1,526,697 | 1 | | | | | | | | ASBESTOS |
| 1,526,698 | 2 | | | | | 5-4-65 | (Removed) | | AS-ASBESTOS |

CHAIN OF CUSTODY: Relinquished ___ _S T. K._ Date _4/5/12_ Received _John Knight_ Date _5-5-12 CROSS_

USPS, Fed-Ex & Other Shippers
_US Postal Service_
Wisconsin Occupational Health Lab
PO Box 7996
Madison, WI 53707-7996

Phone 308 224-6210
800 446-0403
FAX 308 224-6215

_Sampling Service_
_Sampling Questions_
WOHLsampling@mail.slh.wisc.edu
_Web Page/Order Media_
http://www.slh.wisc.edu/ovhl

SAMPLE CONDITION
☒ OK
☐ NOT OK
See Sample Receipt Record

_John Knight - 4-5-12_

Wisconsin Occupational Health Lab
2601 Agriculture Drive
Madison, WI 53718

ENFORCEMENT CONFIDENTIAL   FOIA EXEMPT   DO NOT RELEASE

# WISCONSIN OCCUPATIONAL HEALTH LABORATORY (WOHL) SAMPLE SUBMISSION FORM

Send Results To ATTN: Steven Fridin
WDNR
2984 Shawano Ave
Green Bay, WI 54313

WOHL COMP #
Bill To
Phone # ( 920 ) 662-5443
FAX # ( 920 ) 662-5443
Email Address Steven.Fridin@wisconsin.gov

Project GREEN Wisconsin Subcontracts, LLC

P.O. #

Turnaround:  ☐ RUSH  ☐ PRIORITY  ☒ NORMAL
{ must be prearranged }

Date Sampled

**SPECIAL INSTRUCTIONS**

*υ PLEASE GROUP SAMPLES BY MEDIA USED AND ANALYSIS REQUESTED. •*

| LAB USE ONLY WOHL SAMPLE # | CUSTOMER FIELD # | SAMPLE MEDIA | WIPE SAMPLES SIZE OF AREA WIPED EX: 2 IN x 2 IN | AIR SAMPLES | | | | | ANALYSIS REQUEST |
|---|---|---|---|---|---|---|---|---|---|
| | | | | TIME ON | TIME OFF | TOTAL TIME (MINS) | FLOW RATE (L/MIN) | VOLUME (LITERS) | |
| 1536423 | 3 | | 6-4-15 | | | | | | ASBESTOS (BULK) |

CHAIN OF CUSTODY: Relinquished
UPS, Fed-Ex & Other Shippers
Wisconsin Occupational Health Lab
2601 Agriculture Drive
Madison, WI 53718

US Postal Service
Wisconsin Occupational Health Lab
PO Box 7996
Madison, WI 53707-7996

Phone 608 224-6210
800 446-0403
Fax 608 224-6213

Sampling Questions
WOHLsampling@mail.slh.wisc.edu
Web Page/Order Media
http://www.slh.wisc.edu/wohl

Received
SAMPLE CONDITION
☐ OK   ☐ NOT OK
See Sample Receipt Record

Appendix

Grade Form

Minneapolis, Minnesota



United States Environmental Protection Agency
Office of Enforcement and Compliance Assurance
Office of Criminal Enforcement, Forensics and Training

**ENFORCEMENT CONFIDENTIAL**

**NEIC WORK PRODUCT NO. RP1656R01**

**LABORATORY REPORT**

**Grede Foundry**
Minneapolis, Minnesota
CID Case No.: 0500-0678
NEIC Project No.: RP1656

June 2015

**Project Manager:**

Peggy Forney, Chemist

**Other Contributor:**
Richard Martinez, Chemist

**Principal Analytical Chemist:**
Peggy Forney

**Prepared for:**

EPA Criminal Investigation Division
Chicago Area Office
77 West Jackson, N-19R
Chicago, Illinois 60604

**Authorized for Release by:**

Amy Bern, Laboratory Branch Section Chief

NATIONAL ENFORCEMENT INVESTIGATIONS CENTER
P.O. Box 25227
Building 25, Denver Federal Center
Denver, Colorado 80225-5227

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 96 of 113   Document 72-1

NEIC DOCS_000008

# CONTENTS

EXECUTIVE SUMMARY ............................................................................................... 3
    INTRODUCTION ..................................................................................................... 3
    SUMMARY OF FINDINGS ..................................................................................... 3
LABORATORY ACTIVITIES ....................................................................................... 4
    SAMPLE DELIVERY, RECEIPT, AND TRANSFER ........................................... 4
    ANALYTICAL PROCEDURES AND ANALYSTS ............................................... 4
    ANALYTICAL RESULTS ....................................................................................... 5

## TABLES

1   Select NEIC Laboratory Results........................................................................... 3
2   Laboratory Sample Delivery, Receipt, and Transfer ............................................ 4
3   Analytical Procedures and Analysts ..................................................................... 5
4   Analytical Results ................................................................................................. 5

## APPENDICES

A  NEIC and Wisconsin Occupational Health Laboratory (WOHL) Chain of Custody Records (3 pages)

**This Contents page shows all of the sections contained in this report
and provides a clear indication of the end of this report.**

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 97 of 113   Document 72-1

NEIC DOCS_000009

ENFORCEMENT CONFIDENTIAL -FOIA EXEMPT – DO NOT RELEASE

# EXECUTIVE SUMMARY

## INTRODUCTION

The U.S. Environmental Protection Agency's (EPA) National Enforcement Investigations Center (NEIC) provided laboratory technical assistance to EPA's Criminal Investigation Division (CID) Chicago Area Office for the Grede Foundry investigation in Minneapolis, Minnesota (CID case No. 0500-0678). The NEIC laboratory objectives were to determine the percent and type(s) of asbestos in samples that had been collected by a state agency (Wisconsin Occupational Health Laboratory [WOHL]) as part of a state civil investigation. The NEIC laboratory received three samples on May 12, 2015.

The analyses described in this report were performed by NEIC chemists Peggy Fomey (P. Fomey), and Richard Martinez (R. Martinez) in accordance with the NEIC quality system and are within the scope of NEIC's ISO/EC 17025 accreditation issued by the ANSI-ASQ National Accreditation Board (certificate No. AT-1646).

## SUMMARY OF FINDINGS

Chrysotile asbestos was found in all three samples in amounts of greater than one percent, as summarized in Table 1.

Sample 1526697 is a blend of small white plaster pieces mixed in loose fiberglass. In addition to the mixture, pieces of plaster were pulled out and analyzed separately. Sample 1526698 was a large piece of plaster coated with loose fiberglass and small plaster pieces. A sample of the mixture was analyzed in addition to the plaster. Sample 1536423 was a small container of white plaster pieces.

**Table 1. SELECT NEIC LABORATORY RESULTS[1]**

Grede Foundry
Minneapolis, Minnesota

| WOHL Sample No. | NEIC Laboratory Results | |
|---|---|---|
| 1526697 | Chrysotile asbestos, plaster pieces | 6% |
| | Chrysotile asbestos, mix of plaster and fiberglass | 9% |
| 1526698 | Chrysotile asbestos, plaster pieces | 15% |
| | Chrysotile asbestos, mix of plaster and fiberglass | 9% |
| 1536423 | Chrysotile asbestos, plaster pieces | 12% |

[1] This table summarizes analytical results of samples tested by the NEIC laboratory. The "Laboratory Activities" section presents detailed results.

86

NEIC DOCS_000010

# LABORATORY ACTIVITIES

## SAMPLE DELIVERY, RECEIPT, AND TRANSFER

Evidence receipt information is summarized in **Table 2**. All samples were handled in accordance with the NEIC operating procedure *Evidence Management*, NEICPROC/00-059R4.

**Table 2. LABORATORY SAMPLE DELIVERY, RECEIPT, AND TRANSFER**
Grede Foundry
Minneapolis, Minnesota

| Event | Date | Comments |
|---|---|---|
| Evidence received at NEIC | May 12, 2015 | Locked red and white cooler was received at NEIC on May 12, 2015. Cooler was shipped by UPS, tracking No. 1Z A42 01T 84 9758 8007. The cooler remained in a secure cage in the receiving area until it was picked up on May 14, 2015. |
| Evidence released from locked cabinet and inventoried | May 14, 2015 | NEIC chemist P. Forney accepted custody and inventoried the container. The cooler contained three samples and three chain of custody forms, one from NEIC and two from WOHL. Copies of the chain of custody forms are attached in **Appendix A**. All samples were locked in a secure cabinet in the asbestos laboratory when not being analyzed. |

## ANALYTICAL PROCEDURES AND ANALYSTS

All samples were photographed in the laboratory using a Canon PowerShot A540 digital camera on May 14, 2015. Photographs at higher magnification were taken through a Leica S6D stereo microscope and a Leitz Orthoplan polarizing light microscope with a Q-imaging Micropublisher 3.3 camera during analysis. Chemists Peggy Forney (primary analyst) and Richard Martinez (alternate analyst) performed the polarized light microscopy analyses in May and June 2015. **Table 3** lists analytical procedures and analysts.

All three samples underwent a gravimetric matric reduction procedure to remove interferences. All three samples were prepared in triplicate, with the average of the three results reported. Samples 1526697 and 1526698 both contain a composite of small white plaster pieces in loose fiberglass. Pieces of plaster were pulled out and analyzed separately, in addition to the composite.

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 99 of 113   Document 72-1

NEIC DOCS_000011

**Table 3. ANALYTICAL PROCEDURES AND ANALYSTS**
**Grede Foundry**
**Minneapolis, Minnesota**

| Procedure | Analyst(s) |
|---|---|
| *Digital Camera Guidance for EPA Civil Inspections and Investigations,* EPA-305-F-06-002, July 17, 2006 | Peggy Forney |
| EPA *Test Method for the Determination of Asbestos in Bulk Building Materials,* EPA/600/R-93/116 (gravimetric matrix reduction procedure) | Peggy Forney |
| Interim Method of the Determination of Asbestos in Bulk Insulation Samples, Section 1. Polarized Light Microscopy (Appendix E to Subpart E of 40 Code of Federal Regulations Part 763) and *Determination of Asbestos in Bulk Building Materials,* NEICPROC/01-002R7. Data was entered into a Microsoft Excel 2007 spreadsheet. | Peggy Forney (primary) Richard Martinez (alternate) |

## ANALYTICAL RESULTS

The sample descriptions and PLM results are summarized in **Table 4**. Photographs, a photograph log, and data quality summaries are maintained in the project file.

**Table 4. ANALYTICAL RESULTS**
**Grede Foundry**
**Minneapolis, Minnesota**

| WOHL Sample No. | Laboratory Physical Description | % chrysotile asbestos |
|---|---|---|
| 1526697 | Friable mixture of brown fiberglass, soil, and small white plaster pieces with visible white fibers. | 9 |
| | Several pieces of white and brown plaster treated separately; contain mineral wool, black glass beads | 6 |
| 1526698 | Large piece (2- by 4-inch) friable white plaster with visible white fibers, vermiculite, soil, fiberglass. | 15 |
| | Fiberglass mix coating the large piece of plaster, fiberglass and chrysotile asbestos. | 6 |
| 1536423 | Friable brown and white plaster with visible white fibers, vermiculite, soil, fiberglass. | 12 |

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 100 of 113   Document 72-1

NEIC DOCS_000012



Photo 1   RP1656 5-14-15 001
Cooler as received



Photo 2   RP1656 5-14-15 002
NEIC chain of custody in cooler



Photo 3   RP1656 5-14-15 003
Bag containing 1526697 and 1526698



Photo 4   RP1656 5-14-15 004
Bag containing 1536423



Photo 5   RP1656 5-14-15 005
Sample 1526697, as received



Photo 6   RP1656 5-14-15 006
Sample 1526698, as received

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 101 of 113   Document 72-1
NEIC DOCS_000026



Photo 7  RP1656 5-14-15 007
Sample 1536423 in original tube



Photo 8  RP1656 5-20-15 008
Sample 1536423



Photo 9  RP1656 5-20-15 008
Sample 1536423



Photo 10  RP1656 1536423 S1
Sample 1536423



Photo 11  RP1656 1536423 S2
Sample 1536423



Photo 12  6423 plaster P1
Sample 1536423, chrysotile asbestos

Case 1:17-cr-00050-WCG  Filed 06/12/17  Page 102 of 113  Document 72-1
NEIC DOCS_000027



Photo 13  6423 plaster X1
Sample 1536423, chrysotile asbestos



Photo 14  RP1656 5-20-15 001
Sample 1526697, blend of fiberglass and small white
plaster pieces



Photo 15  RP1656 5-20-15 002
Sample 1526697, blend of fiberglass and small white
plaster pieces



Photo 16  RP1656 1526697 S1
Sample 1526697, blend of fiberglass and small white
plaster pieces



Photo 17  RP1656 1526697 S2
Sample 1526697, blend of fiberglass and small white
plaster pieces



Photo 18  6697 fiberglass R1
Sample 1526697, fiberglass and chrysotile asbestos

Photography by P Forney
May 14, 2015 to June 9, 2015

103

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 103 of 113   Document 72-1

NEIC DOCS_000028



Photo 19  6697 fiberglass DS1
Sample 1526697, fiberglass and chrysotile asbestos
dispersion staining



Photo 20  6697 plaster R1
Sample 1526697, chrysotile asbestos in white plaster
piece



Photo 21  RP1656 5-20-15 003
Sample 1526698, white plaster coated with soil and
fiberglass



Photo 22  RP1656 5-20-15 004
Sample 1526698, white plaster coated with soil and
fiberglass



Photo 23  RP1656 1526698 S1
Sample 1526698, white plaster coated with soil and
fiberglass



Photo 24  RP1656 1526698 S2
Sample 1526698, white plaster coated with soil and
fiberglass

Photography by P Forney
May 14, 2015 to June 9, 2015

NEIC DOCS_000029



Photo 25  6698 fiberglass R1
Fiberglass mix prepared, contains fiberglass and
chrysotile asbestos



Photo 26  6698 plaster R1
Plaster portion, contains chrysotile asbestos,
vermiculite



Photo 27  6698 plaster X1
Plaster portion, contains chrysotile asbestos,
vermiculite



Photo 28  Acid Blank R1
Acid Blank, NIST fiberglass



Photo 29  M2 2001 #4 R1
M2 2001 #4, chrysotile and amosite asbestos



Photo 30  McCrone Chrysotile R1
McCrone prepared slide, chrysotile asbestos

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 105 of 113   Document 72-1   NEIC DOCS_000030



Photo 31 NIST Chrysotile R1
NIST certified chrysotile asbestos



Photo 32 NIST Chrysotile X1
NIST certified chrysotile asbestos



Photo 33 NIST Chrysotile DS1
NIST certified chrysotile asbestos, dispersion staining



Photo 34 QC1 R1
QC 1, chrysotile asbestos

Photography by P. Forney
May 14, 2015 to June 5, 2015

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 106 of 113   Document 72-1
NEIC DOCS_000031

**Case Number**
0500-0678

**Case Title:**
Grede Foundry

**Reporting Office:**
Chicago, IL, Area Office

**Subject of Report:**
Samples

**Activity Date:**
May 4, 201

**Reporting Official and Date:**
William M. Oros Jr.
Special Agent

**Approving Official and Date:**
Randall K. Ashe
Special Agent in Charge

*12-MAY-2015, Signed by: William M. Oros Jr.*

*24-MAY-2015, Approved by: Justin A. Oesterreich*
*Assistant Special Agent in Charge*

**SYNOPSIS**
Samples stored at the Wisconsin State Health Laboratory, Madison WI.

**DETAILS**
On May 4, 2015, this RA picked up sample stored at the Wisconsin State Health Laboratory, Madison WI. The samples were sent to NEIC in Denver Colorado for additional analysis.

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

OCEFT Form 3-01 (01/10)

**Page 1 of 1**

**Case Number:**
0500-0678

**Case Title:**
Grede Foundry

**Subject of Report:**
Kelly Harmsen, December 8, 2015

**Reporting Office:**
Chicago, IL, Area Office

**Activity Date:**
December 8, 2015

**Reporting Official and Date:**
William M. Oros Jr.
Special Agent
*17-DEC-2015, Signed by: William M. Oros Jr.*

**Approving Official and Date:**
Jeffrey D. Martinez
Special Agent in Charge
*18-DEC-2015, Approved by: Jeffrey D. Martinez*
*Special Agent in Charge*

### SYNOPSIS

Harmsen said three or four weeks after he and others removed insulation from the top of the heat treat oven he went to a meeting with other employees and was told specifically by Peter Mark (Mark), Grede Environmental Health and Safety, that testing was done on the insulation he and others removed from the top of the heat treat oven and that there was no asbestos found and that the "head guy" from Grede, Larry Forman (Forman) was also present.

### DETAILS

On December 8, 2015, this Reporting Agent (RA) Will Oros, Special Agent (SA), United States Environmental Protection Agency, Criminal Investigation Division (EPA-CID), Interviewed Kelly Harmsen (Harmsen) regarding the removal of asbestos containing material from the roof of a heat treat oven at the Grede foundry, 242 S. Pearl Street, Berlin, Wisconsin. Harmsen resides at 241 W Moore Street, Berlin, WI 54973; Cellular telephone number 920-361-2754.

In summary and not verbatim, unless otherwise noted, Harmsen provided the following information:

Harmsen said he no longer works for Grede and that the foundry was closing. He provided the name of Amy Brewer (Brewer) a former Grede human resources employee. Harmsen said three or four weeks after he and others removed insulation from the top of the heat treat oven he went to a meeting with other employees and was told specifically by Peter Mark (Mark), Grede Environmental Health and Safety, that testing was done on the insulation he and others removed from the top of the heat treat oven and that there was no asbestos found and that the "head guy" from Grede, Larry Forman (Forman) was also present.

He said after the meeting he confronted Mark and told him a piece of the insulation representing what he and others removed from the heat treat oven was tested and was asbestos. Mark just rolled his eyes at Harmsen. Harmsen said he didn't bring up the sample employees had tested in front of Forman because Forman was a Grede's executive and he didn't want to get fired.

Harmsen said he still had a piece of the insulation he and other removed from the top of the heat treat oven. He said in addition to what he gave WI DNR Warden, Stephan Fabian, he kept a piece of insulation just in case he got sick from working on the removal project. He said following the removal there were still pieces of the insulation of the ground back behind the oven for a while. Harmsen retrieved the piece of insulation he kept from the corner of his garage. The gray block material was double bagged in plastic bags. This RA took the sample which was recorded on a chain of custody and sent to US EPA NEIC for analysis.

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

OCEFT Form 3-01 (01/10)

**Page 1 of 1**



United States Environmental Protection Agency
Office of Enforcement and Compliance Assurance
Office of Criminal Enforcement, Forensics and Training

**ENFORCEMENT CONFIDENTIAL**

**NEIC WORK PRODUCT NO. NEICRP1656R02**

**LABORATORY REPORT**

**Grede Foundry**
Minneapolis, Minnesota
CID Case No.: 0500-0678
NEIC Project No.: RP1656

February 2016

**Prepared By**
Peggy Forney, Chemist

**Prepared for:**
**Special Agent William Oros**
**Minneapolis Resident Office**
EPA Criminal Investigation Division
Chicago Area Office
77 West Jackson, N-19R
Chicago, Illinois 60604

**Authorized for Release by:**

David Parker, Program Coordinator

NATIONAL ENFORCEMENT INVESTIGATIONS CENTER
P.O. Box 25227
Building 25, Denver Federal Center
Denver, Colorado 80225

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 109 of 113   Document 72   NEIC DOCS_000019

# CONTENTS

EXECUTIVE SUMMARY ................................................................................................ 3
    INTRODUCTION ..................................................................................................... 3
    SUMMARY OF FINDINGS ................................................................................... 3
LABORATORY ACTIVITIES ....................................................................................... 4
    SAMPLE DELIVERY, RECEIPT, AND TRANSFER ......................................... 4
    ANALYTICAL PROCEDURES AND ANALYSTS .............................................. 4
    ANALYTICAL RESULTS ..................................................................................... 5

## TABLES

1   Laboratory Sample Delivery, Receipt, and Transfer ................................................. 4
2   Analytical Procedures And Analysts ......................................................................... 4
3   Analytical Results ...................................................................................................... 5

## APPENDIX

A   Chain of Custody Record (1 page)

**This Contents page shows all of the sections contained in this report
and provides a clear indication of the end of this report.**

Case 1:17-cr-00050-WCG    Filed 06/12/17    Page 110 of 113    Document 72    NEIC DOCS_000020

# EXECUTIVE SUMMARY

## INTRODUCTION

The U.S. Environmental Protection Agency's (EPA) National Enforcement Investigations Center (NEIC) provided laboratory technical assistance to EPA's Criminal Investigation Division (CID) Chicago Area Office for the Grede Foundry investigation in Berlin, Wisconsin (CID case No. 0500-0678). The objectives of the analysis was to determine the concentration, in percent, and type(s) of asbestos in a sample that was received from CID Special Agent (SA) William Oros. The NEIC laboratory received one sample on December 14, 2015.

The analyses described in this report were performed by NEIC chemists Peggy Forney (P. Forney), and Richard Martinez (R. Martinez) in accordance with the NEIC quality system and are within the scope of NEIC's ISO/IEC 17025 accreditation issued by the American National Standards Institute-American Society of Quality (ANSI-ASQ) National Accreditation Board (certificate No. AT-1646).

## SUMMARY OF FINDINGS

Chrysotile asbestos was found in the sample identified as Asbestos Block in amounts of greater than one percent. The sample also contained plaster, vermiculite and soil.

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 111 of 113   Document 78   NEIC DOCS_000021

# LABORATORY ACTIVITIES

## SAMPLE DELIVERY, RECEIPT, AND TRANSFER

Evidence receipt information is summarized in **Table 1**. The sample was handled in accordance with the NEIC operating procedure *Evidence Management*, NEICPROC/00-059R4.

**Table 1. LABORATORY SAMPLE DELIVERY, RECEIPT, AND TRANSFER**
**Grede Foundry**
**Minneapolis, Minnesota**

| Event | Date | Comments |
|---|---|---|
| Evidence received at NEIC | December 11, 2015 | Locked cooler was received at NEIC on December 11, 2015. The cooler was shipped by UPS, tracking No. 1Z A42 01T 019 486 8017. The cooler remained in a secure cage in the receiving area until the PAC accepted custody on December 14, 2015. |
| Evidence released from locked cabinet and inventoried | December 14, 2015 | NEIC chemist P. Forney accepted custody and inventoried the container. The cooler contained one sample and one chain of custody form signed by SA William Oros. A copy of the chain of custody form is attached in **Appendix A**. The sample was locked in a secure cabinet in the asbestos laboratory when not being analyzed. |

## ANALYTICAL PROCEDURES AND ANALYSTS

The sample was photographed in the laboratory using a Canon PowerShot A540 digital camera on December 14, 2015. Photographs at higher magnification were taken through a Leica S6D stereo microscope and a Leitz Orthoplan polarizing light microscope with a Q-imaging Micropublisher 3.3 camera during analysis. Chemists P. Forney (primary analyst) and R. Martinez (alternate analyst) performed the polarized light microscopy analyses in January and February 2016. **Table 2** lists analytical procedures and analysts.

The sample underwent a gravimetric matric reduction procedure to remove interferences. The sample was prepared in triplicate, with the average of the three results reported.

**Table 2. ANALYTICAL PROCEDURES AND ANALYSTS**
**Grede Foundry**
**Minneapolis, Minnesota**

| Procedure | Analyst(s) |
|---|---|
| *Digital Camera Guidance for EPA Civil Inspections and Investigations*, EPA-305-F-06-002, July17, 2006 | Peggy Forney |
| EPA *Test Method for the Determination of Asbestos in Bulk Building Materials*, EPA/600/R-93/116 (gravimetric matrix reduction procedure) | Peggy Forney |
| Interim Method of the Determination of Asbestos in Bulk Insulation Samples, Section 1. Polarized Light Microscopy (Appendix E to Subpart E of 40 Code of Federal Regulations Part 763) and *Determination of Asbestos in Bulk Building Materials*, NEICPROC/01-002R8. Data was entered into a Microsoft Excel 2007 spreadsheet. | Peggy Forney (primary) Richard Martinez (alternate) |

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 112 of 113   Document 72-1   NEIC DOCS_000022

ENFORCEMENT CONFIDENTIAL –FOIA EXEMPT – DO NOT RELEASE

## ANALYTICAL RESULTS

The sample description and PLM results are summarized in **Table 3**. Photographs, a photograph log, and data quality summaries are maintained in the project file.

**Table 3. ANALYTICAL RESULTS**
**Grede Foundry**
**Minneapolis, Minnesota**

| Sample Designation | Laboratory Physical Description | % chrysotile asbestos |
|---|---|---|
| Asbestos Block | Friable brown and white plaster with visible white fibers, vermiculite, soil, fiberglass. | 12 |

Case 1:17-cr-00050-WCG   Filed 06/12/17   Page 113 of 113   Document 72   NEIC DOCS_000023